THOMPSON, Judge.
This is an appeal from a judgment denying a custody modification.
On October 30, 1994, S.B.L. (“the mother”) gave birth to D.R. (“the child”). Shortly thereafter, the mother expressed her desire to place the child for adoption. On May 9,1995, the trial court conducted a shelter-care hearing, and, that same day, it entered an order placing the child in the custody of the Calhoun County Department of Human Resources (“DHR”). In its order, the trial court found that, based on an agreement between the parties, the child had “no parent, guardian, custodian, or other suitable person who [was] willing and able to provide supervision and control for [the] child.”
J.R. (“the father”) objected to placing the child for adoption and petitioned for custody of the child. On October 23, 1995, the trial court entered an order finding the child dependent and placing the child in the father’s custody. The trial court further ordered that DHR have protective supervision over the child. That protective supervision by DHR was continued for six months by the trial court following a review hearing on April 29, 1996; the trial court also continued the custody of the child with the father.
An action to modify custody was brought after allegations of abuse against the father arose. The trial court conducted a hearing on the matter on June 10 and 13, and July 8, 1997; on September 3, 1997, the trial court entered an order removing the child from the father’s custody, finding the child dependent for a second time, and placing the child in the custody of E.S. and C.S., who had intervened in the action. As best we are able to determine from the record, E.S. and C.S. were the child’s foster parents while the child was in DHR’s custody and before the child was placed in the father’s custody. In its September 1997 order awarding custody to E.S. and C.S., the trial court found, in pertinent part:
“5) That the father’s treatment of this child is abhorrent and detrimental to the physical and mental well being of the child.
“6) That the child’s mother had for all purposes abandoned the child until brought back into his life by [E.S. and C.S.] at about the time of the filing of the petition for modification of custody.
“7) That throughout this child’s life the only stabilizing factor has been [E.S. and C.S.]
“8) That the natural parents of this child are by their actions unfit to maintain custody of this child and custody should be placed with [E.S. and C.S.]”
The trial court awarded the father and the mother limited visitation with the child. The maternal grandmother, S.B., petitioned for grandparent visitation; by agreement of the parties, she was awarded limited visitation with the child on October 27, 1998.
The parties again went before the trial court in May 1999, after the mother filed a petition for modification of custody. Following a hearing, the trial court entered an order on July 28, 1999, in which it dismissed the mother’s motion based on her failure to prove facts that warranted a modification of custody. However, the trial court found that the parties should begin working on a transition of custody to the mother. In its order of dismissal, the trial court stated that
“a change in custody at the present time is not in the best interest of the child, however; the goal both immediate and long term is to return custody to [the child’s] mother and all of the parties in *1216 this action should begin working toward attaining that goal.”
The trial court ordered the child to attend counseling and also ordered the parties to participate in counseling in order to facilitate the custody transition. The mother did not appeal the custody orders entered on September 3, 1997, and July 28, 1999.
On July 13, 2001, the mother filed a second petition to modify custody in which she alleged that there had been a material change in circumstances since the disposition of her last petition to modify custody and that the best interests of the child would be promoted by a change in custody. E.S. and C.S. filed an answer. On October 25, 2001, the trial court transferred the case to the administrative docket pending the child’s transition into the mother’s home.
On July 29, 2002, Michael Stuckey, the child’s court-appointed counselor, recommended that the child be returned to the mother’s custody on August 2, 2002. E.S. and C.S. filed a motion to stay implementation of the counselor’s recommendation; on August 1, 2002, the trial court issued an order staying the transfer of the child to the mother’s custody. On August 29 and 30, 2002, the trial court held a final hearing; on September 3, 2002, the trial court entered a judgment that denied the mother’s second petition to modify custody. The trial court did, however, modify the mother’s visitation privileges with the child. In its September 3, 2002, judgment, the trial court stated its reasons for denying the mother’s petition to modify custody of the child:
“[E.S. and C.S.] stepped in for this child when the mother had elected to place him up for adoption. The court understood her decision at that time and most certainly does not hold that against her. However, after the child’s father objected and was given custody, the mother had no contact with the child until [E.S. and C.S.] contacted her after allegations of abuse by the father came to light. The mother then filed for custody, [E.S. and C.S.] intervened and they were eventually awarded custody. The child has been in their custody and care for almost all of his eight years and he thinks of them as his ‘parents’ although he is aware that they are not his biological parents.
“The mother is now out of the Army, lives in the home with her mother and her daughter from a prior marriage and is employed full time. She now desires that custody be restored to her. However, after considering the evidence and speaking with the child, it is my opinion that it is in the [child’s] best interest that his custody remain with [E.S. and C.S.] with his mother having specific access times.”
The mother filed a postjudgment motion on September 16, 2002, and on September 22, 2002, the trial court denied that motion. On September 22, 2002, the trial court also clarified its judgment by terminating the maternal grandmother’s separate visitation rights with the child. The mother timely appealed.
At the time of the final hearing in this matter, the child was seven years old. After giving birth to the child, the mother attempted to place the child for adoption. The mother enlisted in the military, and, at some point, she was stationed in Germany.[1] The mother returned to the United States on August 29, 2001, when her tour of duty ended. At the time of the hearing, the mother was serving in the Army Reserves, and she testified that that service *1217 obligation requires a commitment of one weekend per month and two weeks per year.
At the time of the hearing, the mother had lived in Shreveport, Louisiana, for 10 months. The mother resides with the maternal grandmother, the maternal grandmother’s boyfriend, and C.L., the mother’s daughter from a previous marriage. C.L. is 12 years old and is the child’s half-sister. The child has his own room at the house that the mother shares with the maternal grandmother. The mother testified that she has been married three times; two of her marriages ended in divorce and one marriage was annulled. The mother did not marry the child’s father. The mother stated that she is currently not “involved” with anyone.
The mother works as a deputy sheriff at the Catto Parish sheriffs office. The mother’s work shift is 3:00 p.m. until midnight, and the mother is off on Tuesdays and Wednesdays. The mother earns $10.48 per hour and works 40 hours per week. The mother testified that when she is at work the maternal grandmother cares for C.L. and the child, when the child is visiting the mother. The mother stated that she has not applied for other employment with better hours, but she testified that she intends to return to school to get her nursing degree.
The mother testified that she has been investigated twice for child abuse and neglect. One of the charges involved C.L. and occurred when that child was five years old. According to the mother, that charge was “founded.” The second instance involved the mother’s stepson, and, according to the mother, that charge was “unfounded.” The mother also testified that she was molested by her father as a young girl and that her father is still in her life.
According to the mother, the child has a good relationship with C.L., the maternal grandmother, and the maternal grandmother’s boyfriend. C.L. was initially jealous of the child, but, the mother testified, she is no longer jealous. The mother testified that the child sometimes cries at night when he is visiting her in Louisiana. The mother testified that she will do whatever is in the best interests of the child, even if the child does not wish to live with her in Louisiana. The mother further testified that she believed it was in the child’s best interests to live with her.
E.S. and C.S. have been married for 38 years; E.S. is 58 years old and C.S. is 55 years old. The couple have two children, ages 31 and 27. The child has been in the couple’s care since he was 3 weeks old, with the exception of the 18-month period in which the child was in the custody of the father. E.S. is employed and C.S. stays at home with the child.
C.S. testified that the child views her as his “mamma” and E.S. as his “daddy.” C.S. further testified that the child has excelled while living in the couple’s home. The child played “t-ball” for the two years preceding the hearing, and, C.S. stated, he ■ had just finished his first year of basketball. C.S. testified that she is able to keep up with the child’s practices and games and that she attends them all. The child has numerous friends and is very close to E.S. and C.S.’s extended family. C.S. testified that the child receives $100 in child support from the mother each month, and nothing more.
When the trial court initially ordered the child’s transition into the mother’s home in July 1999, C.S. questioned the transition plan because, she testified, the trial court had already decided to place the child in the mother’s home without considering the child’s feelings. C.S. testified that she objected to Stuckey’s recommendation that *1218 custody of the child be returned to the mother because, she stated, the child had attended the counseling sessions without knowing that the purpose of the counseling was to assist in restoring custody of the child to the mother in Louisiana. According to C.S., the child always thought that he would remain in the custody of E.S. and C.S.
Stuckey testified that he has practiced counseling for 28 years and that in the last 15 years he has concentrated on reunification of children and families. The trial court issued its order mandating counseling for the parties on July 28,1999; Stuck-ey testified that he first became involved in this case in August 1999. Stuckey testified that E.S. and C.S. rarely attended the counseling sessions ordered by the trial court. Although the order of the trial court did not specify how often the couple should attend, Stuckey testified that he assumed the couple would attend monthly counseling sessions. C.S. testified that she attended counseling sessions and took the child to his counseling sessions. It was during the child’s counseling sessions that, according to C.S., Stuckey told her that he did not need to see her for counseling at that particular time. C.S. testified that E.S.’s job prevented him from attending counseling sessions. According to Stuck-ey, E.S. and C.S. were initially very angry about the possibility of losing custody of the child; however, he stated that as the child’s counseling sessions progressed the couple’s anger subsided.
Stuckey testified that, in order to make the transition successful for the child, E.S. and C.S. would have to cooperate with the transition plan, be positive about the child’s visits with the mother, and not become emotional when the child was gone. According to Stuckey, E:S. and C.S. tried hard to do those things. C.S. testified that she tried to make the child’s visits with the mother positive and that she sent small gifts with the child to give to C.L.
Stuckey testified that the mother complied with his recommendations in the transition plan and attended counseling sessions in Louisiana. Stuckey stated that, after returning from Germany, the mother spent as much time with the child as possible. Stuckey observed the mother and the child together and noted that the child seemed to be very comfortable with her. Over the course of the child’s visits with the mother, Stuckey observed a positive change in the child’s attitude and an improvement in the child’s relationship with the mother. Stuckey testified that the transition plan was in the child’s best interests and that the more time the child spends with the mother, the more the two will bond. Stuckey testified that it is his opinion that the child would benefit from being with his biological parent and from being with a youthful and energetic mother. According to Stuckey, reunification with the mother is in the child’s best interests.
Stuckey testified that, although the child enjoys visiting the mother, the child has consistently stated that he wants to continue living with E.S. and C.S. in Alabama. Stuckey does not believe that the child will ever affirmatively state that he is ready to live with the mother in Louisiana. Stuck-ey testified that the child perceives E.S. and C.S. as his “psychological” parents and has a very strong relationship with the couple.
Stuckey further testified that he does not believe the transition plan will be detrimental to the child, but he stated that the negative effects on the child of the transition to Louisiana could include depression, inattention at school, and a drop in his academic performance. In addition, Stuckey testified that he is not sure how losing E.S. as a father figure will affect the *1219 child. Stuckey testified that the child will suffer a total disruption to his life by moving from one environment to another; the child will be in a different state and school and will lose his Mends. According to Stuckey, he cannot be certain of the child’s future and how the transition will ultimately affect the child.
Stuckey testified that most transitions involve children who are transitioning back into a home in which they had previously lived; however, in this case the transition involves placing the child in a home that is new to the child and with a parent with whom the child has never resided. Besides the new home, Stuckey expressed concern regarding the mother’s living arrangements with the maternal grandmother and the maternal grandmother’s boy-Mend. Stuckey noted that, at first, he was informed by the mother that her housing situation was temporary but that he-has since learned that it is a permanent arrangement.
Glenda Pritchett, a professional counsel- or in Louisiana, testified that she first counseled the child in March 2001 and that she has met with the child nine times. Pritchett testified that the child has clearly stated that he wants to live in Alabama with E.S. and C.S. Pritchett testified that the child missed E.S. and C.S. while he was in Louisiana and that he complained about missing ball games when he visited with the mother. Pritchett noted that the child appeared to be easygoing and flexible, both of which are characteristics that she believes would ease the child’s transition. Pritchett could not predict how a possible reunification with the mother would affect the child in the future.
On appeal, the mother contends that the trial court abused its discretion when it denied the mother’s petition to modify custody of the child. In support of her argument on appeal, the mother asserts that the child’s interests would best be served if the child were in her custody and that the evidence presented to the trial court indicated that the transition plan instituted by the trial court in its July 28,1999, order had been successful.
The determination of an award of child custody is within the sound discretion of the trial court. Pierce v. Helka, 634 So.2d 1031 (Ala.Civ.App.1994). A trial court’s custody determination following a presentation of ore tenus evidence is presumed correct and that judgment will not be set aside on appeal absent a finding that the trial court abused its discretion or that its determination is so unsupported by the evidence as to be plainly and palpably wrong. Pierce v. Helka, supra.
The law in Alabama is well settled that a natural parent has a prima facie right to the custody of her child. Gurley v. Kennemore, 668 So.2d 1 (Ala.Civ.App.1993); Ex parte Terry, 494 So.2d 628 (Ala.1986). This presumption, however, does not apply after a voluntary forfeiture of custody or where a prior judgment removes custody from the. natural parent and awards it to a nonparent. Ex parte McLendon, 455 So.2d 863 (Ala.1984). When there is a prior custody judgment, the party seeking a change in custody must show that the change in custody will materially promote the child’s best interests and that the benefits of the requested change will more than offset the inherently disruptive effect caused by the uprooting of the child. McLendon, supra.
In the instant case, the trial court’s September 3, 1997, order found both parents to be unfit and removed the child from the father’s custody and placed the child in the custody of E.S. and C.S. The trial court also denied the mother’s first petition to modify custody and again awarded custody to E.S. and C.S. Thus, the trial court’s *1220 orders removing the child from the custody of his parents and placing him in the custody of E.S. and C.S. implicate the Ex parte McLendon standard in any subsequent custody action regarding the child. Accordingly, the mother was required to demonstrate to the trial court that a change of custody of the child would materially promote the child’s best interest and that the benefit of that change would overcome the “ ‘inherently disruptive effect caused by uprooting the child.’ ” Ex parte McLendon, 455 So.2d at 866, quoting Wood v. Wood, 333 So.2d 826, 828 (Ala.Civ.App.1976).
The mother’s conduct reveals that she voluntary forfeited custody of the child. The child was placed in DHR’s custody, at which time it appears that DHR placed the child with E.S. and C.S. At that time, the child was three weeks old. The child was one year old when he was placed in the custody of his father; 18 months later, the child was removed from his father’s custody, and the trial court awarded custody of the child to E.S. and C.S. after the couple intervened in the custody action. The record reveals that the mother helped E.S. and C.S. bring the action to remove the child from the father’s custody but that the mother did not seek custody at that time. In 1999, the trial court denied the mother’s first petition to modify custody; approximately two years later, the mother sought custody of the child in this action.
The evidence presented before the trial court indicates that E.S. and C.S. have cared for the child for six years of his life. The child participates and excels in “t-ball” and basketball. C.S. stays at home with the child and supports all of the child’s extracurricular activities. Testimony revealed that the child has made numerous friends and is very close with E.S. and C.S.’s extended family. The child views E.S. and C.S. as his “psychological” parents, and, throughout the counseling process, the child has consistently voiced his desire to live with E.S. and C.S. Indeed, both the mother and E.S. and C.S. agreed at trial that the child wants to reside with E.S. and C.S. in Alabama.[2]
The mother is employed as a deputy sheriff and works the second shift from 3:00 p.m. until midnight. When the mother is at work while the child is visiting, the maternal grandmother is the primary caregiver to the child. The mother shares a home with the maternal grandmother, the maternal grandmother’s boyfriend, and the mother’s daughter from a prior marriage. The mother indicated that she was not looking for another home, and was not looking for a different job offering hours that would better accommodate taking care of the child.
Both Stuckey and Pritchett testified that the transition plan was in the child’s best interests; however, both admitted that it was difficult to determine if the transition would be successful. If returned to the custody of the mother, the child would possibly suffer from depression and inattention at school and would suffer a total disruption to his life by losing his friends and the only family he has known.
The evidence presented to the trial court by the mother fails to illustrate how a change of custody will materially promote the best interests and welfare of the child so as to outweigh the disruption caused by such a change of custody. See Ex parte McLendon, supra. The mother testified that she believed it would be in the child’s *1221 best interests to live with her in Louisiana, but she failed to present evidence supporting her claim that a change of custody would outweigh the disruption that would certainly be caused if the child was removed from the custody of E.S. and C.S. We note that the mother waited almost five years before petitioning the trial court for custody of the child. For most of his life, the child has been primarily in the custody of E.S. and C.S. Given the evidence before us for review, we cannot say that the trial court erred in dismissing the mother’s petition to modify custody of the child.
AFFIRMED.
YATES, P.J., and PITTMAN and MURDOCK, JJ., concur.
CRAWLEY, J., concurs in the result.

. The record is devoid of any information regarding the exact time the mother enlisted in the military and the date on which she moved to Germany.

. The record indicates that, with the agreement of the parlies, the trial court held an in camera interview with the child during the final hearing. The record does not indicate whether any statements made by the child during the interview affected the judgment of the trial court.