Certiorari Denied, No. 31,417, December 19, 2008

IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: 2009-NMCA-007

Filing Date: October 29, 2008

Docket No.  27,101

IN THE MATTER OF THE
GUARDIANSHIP OF VICTORIA R.,
a Child.

DEBBIE L. and FRANCISCO L.,

 Petitioners-Appellees,

v.

GALADRIEL R.,

 Respondent-Appellant.

and

JEREMY V.,

 Respondent.


APPEAL FROM THE DISTRICT COURT OF SAN JUAN COUNTY
Sandra A. Price, District Judge

Finch & Olson, P.A.
Jennifer L. Olson
Farmington, NM

for Appellees
Caren I. Friedman
Santa Fe, NM

for Appellant

**OPINION**

**ALARID, Judge.**

**{1}** This guardianship proceeding arises out of a dispute among Petitioners, Debbie and Franciso L. (Petitioners), Respondent Galadriel R. (Mother), and Respondent Jeremy V. (Father) over who will have primary responsibility for raising a young child, Victoria R. (Child). Mother and Father are the biological parents of Child. Petitioners are adult caregivers with whom Child has lived for a substantial part of her young life.

**{2}** This case presents a potentially heartbreaking fact pattern: Mother and Father conceive Child during a casual sexual encounter; after birth, Child lives with Mother, while Father lives apart and has limited contact with Child; Mother, who is struggling with emotional problems, leaves Child with Petitioners, who assume day-to-day responsibilities for Child's care; because the placement is informal, amicable, and clearly successful in meeting Child's needs, the State does not become involved in overseeing Child's welfare, and a court is never called upon to enter a formal guardianship or custody order during the period of Mother's parental incapacity; Child lives with Petitioners for a significant period of her young life, forming a stable parent-child bond with Petitioners; later, Mother, asserting that she is now willing and able to care for Child, demands that Petitioners immediately return Child to her; Petitioners refuse to return Child and institute legal proceedings seeking legal recognition of their relationship with Child; ultimately, a court must decide whether Child should remain with Petitioners, whom Child views as her actual parents, or should be returned to Mother, who hopes to re-establish a parent-child relationship with Child.

**{3}** The district court, applying the Kinship Guardianship Act (KGA), NMSA 1978, §§ 40-10B-1 to -15 (2001), appointed Petitioners as Child's guardians and awarded Petitioners all legal rights and duties of a parent with the exception of the right to consent to Child's adoption; the district court awarded Mother substantial visitation. Mother appeals. We affirm.

**DISCUSSION**

**{4}** Prior to the enactment of the KGA, district courts had limited statutory authority to appoint guardians for children. *In re Guardianship of Ashleigh R.*, 2002-NMCA-103, ¶¶ 8-11, 132 N.M. 772, 55 P.3d 984; *see Roberts v. Staples*, 79 N.M. 298, 300, 442 P.2d 788, 790 (1968) (addressing common-law limitations on standing of third parties to seek custody of child through habeas corpus petition). The KGA establishes procedures and substantive standards for effecting legal relationships between children and adult caretakers who have assumed the day-to-day responsibilities of caring for a child. The KGA grants standing to file a petition for a kinship guardianship to three categories of "caregiver." Section 40-10B-5(A). The present case involves a KGA petition based on a "kinship caregiver" relationship. The KGA defines "caregiver" as "an adult, who is not a parent of a child, with whom a child

2

resides and who provides that child with the care, maintenance and supervision consistent with the duties and responsibilities of a parent of the child." Section 40-10B-3(A). The KGA defines "kinship" as "the relationship that exists between a child and a relative of the child, a godparent, a member of the child's tribe or clan or *an adult with whom the child has a significant bond*." Section 40-10B-3(C) (emphasis added).

{5} The KGA provides that:

A. Upon hearing, if the court finds that a qualified person seeks appointment, the venue is proper, the required notices have been given, the requirements of Subsection B of this section have been proved and the best interests of the minor will be served by the requested appointment, it shall make the appointment. . . .

B. A guardian may be appointed pursuant to the Kinship Guardianship Act . . . only if:

(1) a parent of the child is living and has consented in writing to the appointment of a guardian and the consent has not been withdrawn; [or]

(2) a parent of the child is living but all parental rights in regard to the child have been terminated or suspended by prior court order; or

(3) the child has resided with the petitioner without the parent for a period of ninety days or more immediately preceding the date the petition is filed and a parent having legal custody of the child is currently unwilling or unable to provide adequate care, maintenance and supervision for the child or there are extraordinary circumstances; and

(4) no guardian of the child is currently appointed pursuant to a provision of the Uniform Probate Code.

Section 40-10B-8.

{6} We begin our analysis by noting what is not at issue. Mother does not argue that the requirements of Section 40-10B-8(A), including the requirement that Petitioners be qualified persons to bring a KGA action and that Child's best interests will be served by the guardianship, have not been met. Petitioners do not claim that Mother is unwilling or unable to provide Child with adequate care, maintenance, and supervision. There is no dispute that Section 40-10B-8(B)(2) is inapplicable: neither Mother's nor Father's parental rights have been terminated or suspended by court order. There is no dispute that Section 40-10B-8(B)(4) is inapplicable: no guardian is currently appointed for Child under the Probate

3

Code. Further, we do not understand Mother to be arguing that the district court's findings of fact are not supported by substantial evidence; rather, to the extent Mother takes issue with the district court's findings of fact, we understand Mother to be arguing that we should view the evidence in a light more favorable to Mother. Since it is not our function as an appellate court to re-weigh the evidence, and in view of the absence of a proper challenge to the sufficiency of the evidence supporting specific findings, *see generally* Rule 12-213(A)(4) NMRA (specifying manner of attacking finding as not supported by substantial evidence), Mother is bound by the facts as found by the district court. *In re Adoption of Doe*, 98 N.M. 340, 344, 648 P.2d 798, 802 (Ct. App. 1982).

{7} As Mother notes in her brief in chief, "[t]he issue in the trial court essentially boiled down to whether 'extraordinary circumstances' within the meaning of the [KGA] justified the appointment of guardians for [Child]." On appeal, Mother argues that extraordinary circumstances within the meaning of Section 40-10B-8(B)(3) are not present, and therefore the district court should have applied the parental rights doctrine, awarding custody to Mother as Child's fit biological parent without reaching the question of whether appointment of Petitioners as KGA guardians serves Child's best interests. To the extent that Mother's arguments require us to decide what the Legislature meant by "extraordinary circumstances," her arguments present a question of statutory construction subject to de novo review; to the extent her arguments require us to apply this standard to the historical facts found by the district court, Mother's arguments present a mixed question of fact and law, which also is subject to de novo review. *See State v. Attaway*, 117 N.M. 141, 144-46, 870 P.2d 103, 106-08 (1994), *modified on other grounds by State v. Lopez*, 2005-NMCA-018, ¶¶ 13-20, 139 N.M. 9, 116 P.3d 80.[1]

{8} This appeal is the first case in which we have been called upon to review a judgment appointing guardians under the KGA. Previously, in *In re Ashleigh*, a guardianship-custody case that arose before the effective date of the KGA and therefore was not controlled by the KGA, we equated extraordinary circumstances with "'grave reasons' approaching, but not necessarily reaching, those required for termination of parental rights." 2002-NMCA-103, ¶ 25 (citation omitted). Upon further reflection, we note significant differences between termination proceedings and the KGA proceedings that were not considered in *In re Ashleigh*. First, nothing in the KGA suggests that the KGA may be invoked to terminate a parent's rights. Second, unlike the termination of parental rights, a KGA guardianship is revocable. Section 40-10B-11 allows a parent to move to revoke a KGA guardianship upon a showing of a change in circumstances coupled with a showing that revocation of the guardianship is in the best interests of the child. Third, the KGA expressly authorizes a district court to order that the parent retain parental rights and duties. Section 40-10B-13(B).

---

[1]Mother, citing *Santosky v. Kramer*, 455 U.S. 745 (1982), asserts that the district court violated her due process rights by appointing Petitioners KGA guardians. Mother's constitutional argument was not preserved in the district court, and it has not been adequately developed in this Court. We therefore decline to reach it.

4

Thus, as we understand the KGA, the incidents of a KGA guardianship may be narrowly tailored to the circumstances of a given case, depending on the child's needs and the parent's capabilities. Fourth, the KGA provides that a district court retains continuing jurisdiction over a KGA guardianship. Section 40-10B-14. As a parent reestablishes his or her relationship with the child, the parent may invoke the district court's continuing jurisdiction to seek a greater share of parental rights and responsibilities. Our Legislature did not intend a KGA guardianship to completely and irrevocably sever the relationship between a parent and the child, nor did it intend for a KGA guardianship to be a one-size-fits-all remedy. In determining what the Legislature meant by "extraordinary circumstances" in the context of the KGA, we must distinguish the unique provisions of the KGA and the malleable nature of a guardianship established under it from other contexts, in particular, termination of parental rights. Incorporation into the KGA of a substantive standard designed to prevent unjustified termination of parental rights—the most extreme legal intrusion into a parent-child relationship—is not necessary or appropriate in cases brought under the KGA. *Cf. Tailor v. Becker*, 708 A.2d 626, 628-29 (Del. 1998) (upholding Delaware "stepparent custody" statute against substantive due process challenge; observing that awarding custody to a stepparent over the objection of the surviving biological parent "does not work the 'unique kind of deprivation' that follows when the parent-child relationship is totally and irrevocably severed through a decision terminating parental rights" (footnote omitted)); *In re Guardianship of Doe*, 101 P.3d 684, 687 (Haw. Ct. App. 2004) (observing that "a guardianship of a minor is neither absolute nor irrevocable"); *see also Clark v. Wade*, 544 S.E.2d 99, 105-05, 107-08 (Ga. 2001) (noting distinction for purposes of constitutional analysis between termination of parental rights and third party custody cases; concluding that custody may be awarded to third party absent finding of parental unfitness).

{9}     The statutory term "extraordinary circumstances" must be read against two bodies of law. The first is the common-law parental rights (also known as the parental preference) doctrine. *Shorty v. Scott*, 87 N.M. 490, 493, 535 P.2d 1341, 1344 (1975). Applied to a custody dispute between a biological parent and a third party, the parental rights doctrine is said to create a presumption that the best interests of the child[2] will be served by granting

---

[2]This formulation of the parental rights doctrine, which refers to the best interests of the child, is easily misunderstood. The substantive standard governing a custody dispute between a non-parent third party and a parent is not the best interests of the child in the welfare-maximizing sense that the term is used in custody disputes between parents. In a custody dispute between a biological parent and a third party, the concern is not with who will provide the child with *better* care, but rather, whether the biological parent is willing and able to provide her child with *adequate* care. Indeed, the very point of the parental rights doctrine is to prevent a court from basing a custody decision on evidence that the third party might, in fact, better provide for the child than the biological parent. *See Reno v. Flores*, 507 U.S. 292, 304 (1993) ("Even if it were shown, for example, that a particular couple desirous of adopting a child would *best* provide for the child's welfare, the child would nonetheless not be removed from the custody of its parents so long as they were providing for the child

custody to the natural parent. *Id.* However, the presumption arising from the parental preference doctrine is "never conclusive" and may be overcome by a showing of either "serious parental inadequacy" or "extraordinary circumstances." *In re Adoption of J.J.B.*, 119 N.M. 638, 652, 894 P.2d 994, 1008 (1995). Under *In re J.J.B.*, extraordinary circumstances supplement "traditional parental unfitness criteria" and address "unique situations that are beyond the usual unfit-parent criteria and are not expressly covered by statute or case law." *Id.* We will assume that in enacting the KGA, the Legislature employed the term extraordinary circumstances against the background of our Supreme Court's discussion of the parental rights doctrine in *In re J.J.B. See State v. Morrison*, 1999-NMCA-041, ¶ 9, 127 N.M. 63, 976 P.2d 1015 (observing that "[i]n the absence of evidence to the contrary, we interpret statutes using the common law concept 'most likely intended by the legislature to be embodied in the statute'" (quoting *State v. Yarborough*, 1996-NMSC-068, ¶ 11, 122 N.M. 596, 930 P.2d 131)). Extraordinary circumstances for purposes of the KGA are circumstances other than the parent's current[3] inability or unwillingness to provide the child with adequate care, maintenance, and supervision that justify appointing guardians for a child over the objections of the child's parents.

{10}    The second body of law we must consider is constitutional law. There are constitutional limits on a state's authority to award custody of a child to a third party over the objection of a fit biological parent.[4] *In re Interest of E.L.M.C.*, 100 P.3d 546, 552, 562

---

*adequately.*" (emphasis in original)). It more accurately reflects the actual reasoning of a court resolving a third-party custody case to say that (1) the law presumes that parents are willing and able to adequately care for their child, and (2) parents who are willing and able to adequately care for their child cannot be deprived of custody because some third person is better able to care for their child.

[3]Where at the time a KGA petition is filed the parent "is *currently* unwilling or unable to provide adequate care, maintenance and supervision for the child" there will be no need to consider whether extraordinary circumstances are present: no court will transfer custody of a child to a parent who demonstrably is unwilling or unable to care for her child. The alternative extraordinary circumstances sub-prong of Section 40-10B-3(B)(3) is particularly likely to be implicated in "reunification" cases—cases where the parent experienced a past period of parental unfitness, but where as of the time the KGA petition is brought the parent asserts that she has overcome the conditions that rendered her unwilling or incapable of caring for her child. In such cases the court must decide whether the current consequences to the child of the parent's past unfitness amount to extraordinary circumstances.

[4]The United States Supreme Court's decision in *Troxel v. Granville*, 530 U.S. 57, 65 (2000), has led courts and commentators to reexamine the issue of how much deference to a parent's childrearing decisions is required by the Constitution. *Troxel*, a grandparent visitation case, fragmented the Supreme Court, resulting in six opinions—a four justice

6

(Colo. Ct. App. 2004) (applying strict scrutiny; upholding order awarding joint parental responsibility to biological mother and her former domestic partner). The common-law parental preference doctrine itself "seeks to give great deference to the constitutional rights of parents to raise their children while at the same time recognizing that when there is a conflict between those rights and the equally important constitutional rights of children, the latter will not automatically be subjugated to the former." 2 Sandra Morgan Little, *Child Custody & Visitation Law and Practice* § 11.03[1] (2008). In construing the KGA, we will assume that the Legislature intended the extraordinary circumstances standard to be sufficiently demanding to protect the constitutional rights of biological parents who oppose KGA petitions. *See Hughes v. Timberon Water & Sanitation Dist.*, 1999-NMCA-136, ¶ 10, 128 N.M. 186, 991 P.2d 16 (observing that "[a]lthough we rest our decision in this case on our interpretation of the statutory language, not constitutional doctrine, it is appropriate for a court interpreting a statute to consider whether a particular interpretation is likely to create problems arising from constitutional doctrine").

**{11}** In considering the constitutional implications of a KGA guardianship, we must bear in mind that the subject of this contested KGA proceeding—Child—is herself a "person" for purposes of the Fourteenth Amendment. *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969). KGA guardianship cases do not present a "bipolar" contest between parents and the party invoking the authority of the state to override the decision of the child's parents: "[t]here is at a minimum a third individual, whose interests are implicated in every case to which the statute applies—the child." *Troxel*, 530 U.S. at 86 (Stevens, J., dissenting) (referring to Washington third-party visitation statute). "Although parents have certain rights regarding their children, the children also have certain fundamental rights which often compete with the parents' interests." *Oldfield v. Benavidez*, 116 N.M. 785, 790, 867 P.2d 1167, 1172 (1994). "Children, too, have fundamental rights—including the fundamental right to be protected from neglect and to 'have a

---

plurality, two concurring opinions, and three dissenting opinions. Only Justice Thomas, in a concurring opinion, relied upon a fundamental rights-strict scrutiny analysis. *Troxel*, 530 U.S. at 80 (Thomas, J., concurring). Some authorities, noting that only Justice Thomas expressly relied upon textbook fundamental rights-strict scrutiny analysis, have read *Troxel* as moving away from the rigid strict scrutiny mode of analysis of state legislation that impinges on parents' control over the upbringing of their children. *In re Marriage of O'Donnell-Lamont*, 91 P.3d 721, 730 (Ore. 2004) (observing that a majority of the *Troxel* Court relied upon a standard that is "undefined but less exacting" than the strict scrutiny standard cited by Justice Thomas); David D. Meyer, *Constitutional Pragmatism for a Changing American Family*, 32 Rutgers L.J. 711, 714 (2001) (stating that *Troxel* amounts to "an implicit rejection of strict scrutiny"). For a probing examination of the development of substantive due process protection of parental rights *see* Susan E. Lawrence, *Substantive Due Process and Parental Rights: From Meyer v. Nebraska to Troxel v. Granville*, 8 J.L. & Fam. Stud. 71 (2006) (tracing constitutional protection of parental rights from its genesis in *Lochner*-era substantive due process cases).

7

placement that is stable [and] permanent.' Children are not simply chattels belonging to the parent, but have fundamental interests of their own that may diverge from the interests of the parent." *In re Jasmon O.*, 878 P.2d 1297, 1307 (Cal. 1994) (in bank) (alterations in original) (citations omitted). "[W]e would be remiss if we did not also reiterate that '[a] child has rights, too, some of which are of a constitutional magnitude.'" *Clifford K. v. Paul S.*, 619 S.E.2d 138, 159 (W.Va. 2005) (citation omitted); *see generally* Suellyn Scarnecchia, *A Child's Right to Protection from Transfer Trauma in a Contested Adoption Case*, 2 Duke J. Gender L. & Pol'y 41 (1995); David D. Meyer, *The Modest Promise of Children's Relationship Rights*, 11 Wm. & Mary Bill Rts. J. 1117 (2003). **{12}** Our Legislature clearly knows how to draft a statute mandating a strict application of the parental rights doctrine, as for example in NMSA 1978, Section 40-4-9.1(K) (1999), addressing third party custody in the context of dissolution of marriage. Although the Legislature in enacting the KGA expressed a preference for having children raised by their biological parents, Section 40-10B-(2)(A), there is no provision in the KGA comparable to Section 40-4-9.1(K). Section 40-4-9.1(K) is tailored to the context of the breakup of a pre-existing family through divorce. As the present case illustrates, the child who is the subject of a KGA proceeding may never have lived in a traditional family and may not have an established parent-child relationship with either of its biological parents.

> My principal concern is . . . the assumption that the parent or parents . . . have always been the child's primary caregivers and that the third parties . . . have no legitimate and established relationship with the child. That idea, in turn, appears influenced by the concept that the conventional nuclear family ought to establish the . . . standard for every domestic relations case. As we all know, this is simply not the structure or prevailing condition in many households. For many boys and girls a traditional family with two or even one permanent and caring parent is simply not the reality of their childhood.

*Troxel*, 530 U.S. at 98 (Kennedy, J., dissenting) (citation omitted). A parental preference tailored to the breakup of a nuclear family is not necessarily appropriate in contexts addressed by the KGA. We conclude that the Legislature understood and intended that in applying "extraordinary circumstances" in the context of KGA guardianship proceedings, courts should not be limited by the parental rights doctrine to the same degree as in divorce proceedings, and that courts would have discretion to carefully balance the constitutionally protected interests of biological parents in re-establishing a parent-child relationship with their biological offspring against the important interests of children in maintaining stable and nurturing relationships with third-party caregivers who functioned as parents during the natural parents' incapacity or absence. *Cf. In re Doe*, 98 N.M. at 344, 648 P.2d at 802 (acknowledging the Legislature's authority to modify the "primacy of parental rights" approach of *Shorty* in favor of the welfare and needs of children who have come to look to third-party caregivers "for all of the love, affection, instruction, and physical needs that the natural parents have failed to provide").

8

**{13}**  In the present case, the district court made the following findings:

1.  The minor child at issue . . . was born July 14, 1999.
. . . .

9.  Beginning when [Child] was about one and a half years old, [Mother] began to leave [Child] in the care of the Petitioners.

10.  From that time, [Mother] continued to leave [Child] with the Petitioners for increasing periods of time.

11.  By the time [Child] was three and a half years old she was living with the Petitioners for more than half of the time.

12.  In the Spring of 2003, [Mother] moved to Colorado, leaving [Child] to live full-time with the Petitioners in Aztec, New Mexico.

13.  [Mother] expressed to the Petitioners that [Child's] placement with them would be permanent and that she would not seek [Child's] return to her home.

14.  Prior to the filing of this action, [Mother] indicated to the Petitioners that they could adopt [Child].

15.  After the Spring of 2003 and before this action was filed in November 2004, [Mother's] visits and telephone calls with [Child] were infrequent.

. . . .

19.  The Petitioners have provided all of [Child's] support (housing, clothing, food, etc.) for most of her life.

20.  The Petitioners potty trained [Child].

21.  The Petitioners enrolled [Child] in school.

22.  The Petitioners provided [Child] medical care for most of her life.

23.  [Child] has had her own room in the Petitioners' home  most of her life.

24.  The Petitioner Francisco L[.] is the only father that [Child]

9

knows.

25. [Child] is primarily bonded to the Petitioners and considers them her parents.

26. [Child] refers to the Petitioners as "mom" and "dad."

27. [Child] considers the Petitioners and their extended family her family.

28. The Petitioners have provided [Child] with stability for most of her life.

29. The Petitioners will continue to provide [Child] with stability.

30. [Mother] has not paid support for [Child] to the Petitioners.

31. [Child] would experience a significant degree of depression if removed from the primary care of the Petitioners.

Relying on these findings, the district court concluded that "[t]here is a significant and important bond between [Child] and the Petitioners"; "Petitioners have provided and will continue to provide stability to [Child]"; "[t]here is a substantial likelihood of serious psychological and emotional harm if [Child] is removed from the home of the Petitioners and placed with [Mother]"; "[i]t is in the [Child's] best interests to award a kinship guardianship of her to the Petitioners"; and "there are extraordinary circumstances that warrant the grant of a kinship guardianship."

{14} The district court's findings implicate the crucial distinction between biological parentage and psychological parentage. *In re J.M.P.*, 528 So. 2d 1002, 1013-14 (La. 1988) (discussing psychological parent concept). Psychological parents[5] are the adult caregivers who meet the child's emotional and physical needs on a day-to-day basis for a sufficient period of time that the child comes to view the adult caregivers as the child's actual parents. *Middleton v. Johnson*, 633 S.E.2d 162, 168 (S.C. Ct. App. 2006); American Law Institute,

---

[5]There is some variation in the terminology used to describe a psychological parent-child relationship. *In re Parentage of L.B.*, 122 P.3d 161, 167-68 n.7 (Wash. 2005). Some authorities employ the term "de facto parent" or "in loco parentis" to describe this relationship. *Id.* In deference to our Legislature, which has employed the term "psychological parent" in the Children's Code, NMSA 1978, §§ 32A-4-28(B)(3)(c) (2005) and 32A-5-15(B)(3)(c) (1995) (incorporating "psychological parent" concept as an element of statutory presumptive abandonment), we will employ the term psychological parent.

*Principles of the Law of Family Dissolution* § 2.03(1)(c) (2002) (defining "de facto parent"); Joseph Goldstein, et al., *The Best Interests of the Child: The Least Detrimental Alternative* 9 (1994) ("Unlike adults, children have no psychological conception of blood-tie relationships until quite late in their development. . . . What matters to them is the pattern of day-to-day interchanges with the adults who take care of them and who, on the strength of such interactions, become the parent figures to whom they are attached."). Obviously, the optimal situation occurs when a child's biological parents build upon the opportunity presented by biological parentage to create a stable, nurturing relationship that meets the child's physical and emotional needs. Equally obvious, not all biological parents seize the opportunity presented by biological parentage, with the consequence that significant numbers of children have psychological parents who are not their biological parents. A principal concern motivating courts and legislatures to give legal recognition to psychological parent-child relationships is the belief that, apart from heart-wrenching short-term emotional loss, depriving a child of an established, nurturing psychological parent-child relationship is seriously detrimental to the child's long-term emotional health and development. *In re E.L.M.C.*, 100 P.3d at 559-61 (collecting authorities); *see also* David E. Arrendondo and Leonard P. Edwards, *Attachment, Bonding, and Reciprocal Connectedness: Limitations of Attachment Theory in the Juvenile and Family Court*, 2 J. Center for Families, Child. & Cts. 109, 112 (2000) (arguing for use of the term "reciprocal connectedness" to describe healthy, two-way bonding between a child and the child's adult caregivers; asserting that such a relationship is "essential for the normal development of a child's capacities for empathy, compassion, and other higher-level human emotions and social skills"). Although the district court did not employ the term "psychological parent," its findings are consistent with this well-established concept: Child has bonded with Petitioners, whom Child views as her actual parents, to the extent that Child will experience serious psychological and emotional harm if her relationship with Petitioners is terminated.[6]

{15}     Notwithstanding continued adherence to some form of the parental preference

---

[6]Some courts have adopted a four-prong test for determining whether a psychological parent-child relationship is present. *E.g.*, *In re E.L.M.C.*, 100 P.3d at 560. This test is designed to strictly limit the class of persons who qualify as psychological parents, thereby protecting biological or other legal parents from the burden of defending against claims by baby sitters, nannies, neighbors, relatives, adult friends, or other third parties who might seek to establish legal rights with respect to a child. *Id.* It appears that even under the stringent four-prong test set out in *In re E.L.M.C.,* Petitioners would qualify as psychological parents: (1) Mother consented to and fostered the formation of a parent-like relationship between Petitioners and Child; (2) Petitioners and Child lived together in the same household for a substantial period of time; (3) Petitioners assumed the obligations of parenthood by taking significant responsibility for Child's care, education, and development, including contributing towards Child's support, without expectation of financial compensation; and (4) Petitioners have established a bonded, parental relationship with Child, who views Petitioners as her mother and father.

11

doctrine, a growing number of jurisdictions, whether by judicial decision or statute, now provide legal recognition and protection to psychological parent-child (or equivalent) relationships. *Kinnard v. Kinnard*, 43 P.3d 150, 151 (Alaska 2002) (stepparent custody); *Riepe v. Riepe*, 91 P.3d 312, 315 (Ariz. Ct. App. 2004) (stepparent visitation); *Robinson v. Ford-Robinson*, 208 S.W.3d 140, 144 (Ark. 2005) (stepparent visitation); *Erika K. v. Brett D.*, 75 Cal. Rptr. 3d 152, 154 (Ct. App. 2008) (godmother custody); *In re E.L.M.C.*, 100 P.3d at 562 (former domestic partner custody); *Fish v. Fish*, 939 A.2d 1040, 1044 (Conn. 2008) (aunt custody); *Tailor*, 708 A.2d at 629-30 (stepparent custody); *Stockwell v. Stockwell*, 775 P.2d 611, 613-14 (Idaho 1989) (stepparent custody); *Francies v. Francies*, 759 N.E.2d 1106, 1109 (Ind. Ct. App. 2001) (grandmother custody); *In re Guardianship of Knell*, 537 N.W.2d 778, 783 (Iowa 1995) (stepparent permanent guardianship); *Rideout v. Riendeau*, 761 A.2d 291 (Me. 2000) (grandparent visitation); *Youmans v. Ramos*, 711 N.E.2d 165, 167 (Mass. 1999) (aunt-former guardian visitation); *Mason v. Dwinnell*, 660 S.E.2d 58, 62 (N.C. Ct. App. 2008) (former domestic partner custody); *Mansukhani v. Pailing*, 318 N.W.2d 748, 749 (N.D. 1982) (grandparent custody); *V.C. v. M.J.B.*, 748 A.2d 539, 541-42 (N.J. 2000) (former domestic partner visitation); *In re O'Donnell-Lamont*, 91 P.3d at 724, 730 (grandparent custody); *T.B. v. L.R.M.*, 786 A.2d 913, 914 (Pa. 2001) (former domestic partner visitation-partial custody); *Rubano v. DiCenzo*, 759 A.2d 959, 961-62 (R.I. 2000) (former domestic partner visitation); *Middleton*, 633 S.E.2d at 164, 168 (former domestic partner visitation); *Paquette v. Paquette*, 499 A.2d 23, 25 (Vt. 1985) (stepparent custody); *In re L.B.*, 122 P.3d at 163-64, 167-68 n.7 (former domestic partner custody); *Clifford K.*, 619 S.E.2d at 144, 159 (former domestic partner custody); *In re Custody of H.S.H.-K.*, 533 N.W.2d 419, 420 (Wis. 1995) (former domestic partner visitation); *see also S.B.L. v. E.S.*, 865 So. 2d 1214, 1219-20 (Ala. Civ. App. 2003) (applying Alabama rule that biological parent who has voluntarily relinquished custody of child bear the burden of establishing that transfer of custody back to biological parent will "materially promote the child's best interests"; upholding decision of trial court declining to order transfer of seven-year-old child from home in which he has lived most of his life; noting evidence that child viewed third-party custodians as his "psychological" parents); *In re Custody of T.W.*, 851 N.E.2d 881, 882-83 (Ill. Ct. App. 2006) (applying Illinois statute granting standing to a third party to seek custody of child where child is not in the physical custody of either of her parents; upholding award of custody to maternal grandparents with whom the child had a close relationship and with whom the child had lived for most of her life); *Osburn v. Roberts*, 169 P.2d 293, 294 (Okla. 1946) (upholding decision of trial court denying father's application for writ of habeas corpus seeking custody of three-year-old child and allowing the child to remain in the custody of the child's aunt and uncle who had raised the child from infancy following death of the child's mother; observing that "when asked to take the custody from those who have for a considerable period of time nurtured and cared for the child and to restore it to the parent, it is proper for the courts to consider the ties of love and confidence that have grown up between the child and its foster parents and whether it is best for the child not to disturb that relationship"); *C.B. v. M.M.C.*, 2006 WL 1229643, 1 (Minn. Ct. App. May 9, 2006) (unpublished) (applying Minnesota de facto custodian statute; upholding award of custody to uncle and paternal aunt). Older New Mexico cases also support recognition of psychological parentage. *Cook v. Brownlee*, 54 N.M. 227, 230, 220 P.2d

12

378, 381 (1950) (upholding decision of trial court finding that best interests of the child would be served by allowing the teenaged child to remain in custody of maternal grandfather following death of mother rather than returning the child to father with whom the child was barely acquainted ); *Pra v. Gherardini*, 34 N.M. 587, 588, 286 P. 828, 829 (1930) (upholding dismissal of biological mother's habeas petition seeking custody of her nine-year-old son following death of the child's maternal aunt; noting evidence that mother had voluntarily delivered the child as infant to aunt and uncle, that aunt and uncle had cared for the child "as if he were their own son," and that uncle and the child "have become greatly attached to and love each other as father and the child").

**{16}**    Following the lead of these authorities, we hold that a showing that the KGA petitioners have assumed the role of the psychological parents of the child who is the subject of the KGA proceeding to the extent that the child will suffer a "significant degree of depression" if the relationship with the psychological parents is abruptly terminated is sufficient to rebut the presumption that the biological parent is acting in the child's best interests and to establish extraordinary circumstances within the meaning of the KGA. Under such circumstances the State may override a rehabilitated biological parent's demand for immediate and exclusive custody of the child and may impose a KGA guardianship to protect the child's emotional well-being.

**{17}**    Mother, citing *In re Ashleigh*, 2002-NMCA-103, ¶ 27, argues that if we uphold the KGA guardianship, we are penalizing her for doing the right thing by voluntarily placing Child with Petitioners. Mother's argument misses the point: the State's concern in recognizing and protecting the parent-child relationship that arose between Petitioners and Child is not to penalize Mother, but to deal with the present consequences of Mother's past incapacity in a way that minimizes the adverse effects on Child.  "From a child's point of view, no absence from her parents is temporary if it exceeds the period of time during which the child, always according to her age and stage of development, can preserve inner ties to them."  Goldstein, *supra*, at 104-05.  The inescapable fact creating the tension between Child's needs and Mother's desire to immediately resume parenting is that, during the period Mother was struggling with her own problems, Child moved on emotionally.

**{18}**    We recognize that our reliance on the psychological-parent concept as the justification for overriding Mother's assertion of a right to immediate custody of Child has constitutional implications.   Substantive due process analysis requires a "'careful description' of the asserted fundamental liberty interest." *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (citation omitted); *Tailor*, 708 A.2d at 628.  Broad references to the fundamental liberty interest of a biological parent, *see, e.g., In re Ashleigh*, 2002-NMCA-103, ¶ 27, can be misleading if taken out of a particular factual or legal context.  To our knowledge, the United States Supreme Court has never recognized a fundamental right of biological parents to engage in off-again, on-again parenting without regard to the effects this pattern of parenting has on children.  Indeed, the extent to which a biological parent's relationship with his or her offspring is afforded constitutional protection is directly related to the degree to which the biological parent actually has assumed the responsibilities of

13

parenthood. *See Lehr v. Robertson*, 463 U.S. 248, 259-60 (1983) (noting "the clear [constitutional] distinction between a mere biological relationship and an actual relationship of parental responsibility"). "A parent's rights with respect to [his or] her child have . . . never been regarded as absolute, but rather are limited by the existence of an actual, developed relationship with a child, and are tied to the presence or absence of some embodiment of family." *Troxel*, 530 U.S. at 88 (Stevens, J., dissenting). Significantly, for purposes of constitutional analysis, the present case does not involve a third party invoking the power of the State to break up an established family; rather, to the contrary, it involves a biological parent asking the State to terminate a stable parent-child relationship that has been demonstrably successful in meeting a child's needs and that arose with the biological parent's consent and encouragement. *See Clark*, 544 S.E.2d at 108 ("[T]he custody cases in this appeal do not involve a third party seeking to intrude upon an established parent-child custodial relationship. Instead, they involve a biological parent seeking to gain custody from a third party who has been responsible for the daily care of the child and already has established a family unit for the child."). Although Mother is entitled to a meaningful opportunity to re-establish a parent-child relationship with Child and, if reasonably possible, to eventually re-assume the role of Child's primary caregiver, Mother does not have an unqualified constitutional right to terminate at her whim the stable, nurturing parent-child relationship that naturally and foreseeably arose between Child and Petitioners during the period that Mother was unwilling or unable to care for Child. *Youmans*, 711 N.E.2d at 172-73; *cf. Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) (upholding adoption under "best interests of the child" standard against substantive due process challenge of biological father, who had not been found to be unfit; observing that the adoption would not place child with a new set of parents with whom the child had never lived, but rather would "give full recognition to a family unit already in existence").

**{19}**   We note an alternative ground supporting the appointment of Petitioners as KGA guardians: Father's consent. Father was present at the evidentiary hearing on Petitioners' petition. Father testified that he learned that Child was living with Petitioners when Child was around two or two-and-a-half years old. Father testified that he had consented in writing to the guardianship and that he believed that the guardianship would be in Child's best interest. Although Father has had little involvement in Child's life other than through court-ordered child support, his parental rights have not been terminated, and the district court did not find him to be unfit. The district court found that Father consented to the guardianship pursuant to Section 40-10B-8(B)(1). In view of Father's consent to the guardianship, the present proceeding is not a pure dispute between natural parents and third parties; it has aspects of a dispute between two fit legal parents, one of whom maintains that placing the child with a third party will be in the child's best interest.[7] Where two legal parents disagree over where the best interests of their child lie, neither parent has an absolute, unilateral right to decide where the child's best interest lie. *See* Little, *supra*, § 10.03[2] (observing that

---

[7]Father testified that due to his concerns about Mother's capabilities, he would seek custody of Child if Petitioners were not appointed as Child's guardians.

"[a]s long as there is no court directive in effect, both parents continue to have equal rights in the child"). The present case clearly is materially distinguishable from *Shorty*, 87 N.M. at 491-92, 535 P.2d at 1342-43, where the sole surviving parent sought to regain custody from the maternal grandmother, and from *In re Ashleigh*, 2002-NMCA-103, ¶ 11, where both biological parents opposed appointing the maternal grandmother and her husband as guardians.

**{20}** The judgment of the district court is affirmed.

**THE SPECIAL CONCURRENCE**

**{21}** There is no argument made here that *Ashleigh* was incorrectly decided; what is disputed is that as a case decided under the probate code it should constitute binding precedent in the first KGA case decided by this Court. Had *Ashleigh* actually analyzed the KGA, ignoring the advisory nature of that analysis, perhaps there would be some justification for recognizing it as the seminal case in the area. The entire discussion of this new statute is contained in three sentences in *Ashleigh*, 2002-NMCA-103, ¶ 15. As far as the case before us is concerned, the discussion of the KGA in *Ashleigh* is pure dicta. The KGA deserves a case which fully analyzes its many provisions and recognizes that the statute represents a significant change in the area of children's rights; the KGA, as discussed earlier, in keeping with the national trend in this area, recognizes the emergence of a new body of children's rights.

**{22}** **IT IS SO ORDERED.**

---

**A. JOSEPH ALARID, Judge**

**JONATHAN B. SUTIN, Chief Judge (specially concurring)**
**LYNN PICKARD, Judge (specially concurring)**

**PICKARD, Judge (specially concurring).**

**{23}** As we disagree with portions of Judge Alarid's opinion as well as the expansive and unnecessary rationales relied on to affirm, what is contained in this specially concurring opinion is actually the opinion of this Court. *See State v. Mann*, 2000-NMCA-088, ¶ 2, 129 N.M. 600, 11 P.3d 564 (stating that when the lead opinion is the opinion only of the author and when the two other judges disagree with that author, the lead opinion is the dissent and the opinion of the Court is contained in the separate opinion); *Gracia v. Bittner*, 120 N.M. 191, 195, 900 P.2d 351, 355 (Ct. App. 1995) (stating that when a majority of the five justices of the Supreme Court do not concur in the opinion, the opinion is not an opinion of the Supreme Court); *Baxter v. Gannaway*, 113 N.M. 45, 47-48, 822 P.2d 1128, 1130-31 (Ct.

App. 1991) (stating that one-judge opinions are not precedential).

**{24}** We write separately because we believe that this case may be decided on the basis of existing New Mexico law, without disregarding or implicitly overruling the recently decided *Ashleigh* case, and without relying on authority from other jurisdictions that the parties have not cited or relied on and that decides issues that are not before us and that are not necessary to decide in this case. We also believe Mother to be making a substantial evidence argument as a subsidiary argument to bolster her legal argument that the extraordinary circumstances requirement was not met. We believe it is first necessary to address Mother's substantial evidence challenge to the historical facts before we address her legal argument. *See State v. Attaway*, 117 N.M. 141, 144, 870 P.2d 103, 106 (1994) ("Initially, the trial court must establish the historical facts that animate the transaction to be evaluated."). We reject both the substantial evidence and the legal arguments.

**{25}** Mother's brief in chief argues that "[t]here was not clear and convincing evidence to support a finding that extraordinary circumstances justified the establishment of a guardianship," and "as discussed above, there was not clear and convincing evidence of extraordinary circumstances to justify application of the [KGA]." Mother's reply brief then spends several pages evaluating the evidence in the light most favorable to herself. On appeal, we review the evidence in the light most favorable to support the findings, and we disregard contrary evidence. *See In re R.W.*, 108 N.M. 332, 334-35, 772 P.2d 366, 368-69 (Ct. App. 1989). Disregarding Mother's recitation of the evidence favorable to her and her explanation of why certain adverse inferences should not have been drawn against her, we hold that there was sufficient evidence to support the findings of the district court recited in the lead opinion in this case because Mother does not point to the evidence that arguably supports those findings and show why that evidence was not sufficient. *See Aspen Landscaping, Inc. v. Longford Homes of N.M., Inc.*, 2004-NMCA-063, ¶ 28, 135 N.M. 607, 92 P.3d 53.

**{26}** Summarized, those findings are that (1) Mother left Child with Petitioners for increasing amounts of time for close to three years and that amount of time became full time for many months prior to the institution of these proceedings; (2) Mother's contact with Child became increasingly less frequent; (3) Mother told Petitioners that the placement would be permanent, that she would not seek Child's return, and that Petitioners could adopt Child; (4) Child was primarily bonded to Petitioners and considered them her parents; (5) Mother did not support Child; (6) Father consented to the guardianship; and (7) Child would experience a significant degree of depression, characterized as serious psychological and emotional harm, if she were removed from Petitioners. The legal question in this case is whether these factors, taken together under all the circumstances of this case, amount to extraordinary circumstances.

**{27}** Our Supreme Court established the requirement of extraordinary circumstances in *In re Adoption of J.B.B.*, 119 N.M. at 652, 894 P.2d at 1008. We elaborated on this requirement in *Ashleigh*, 2002-NMCA-103, ¶¶ 24-32. Both *J.B.B.* and *Ashleigh* cited several

of the same out-of-state cases, and *Ashleigh* relied on several others, to give concrete examples of what other states had held to be extraordinary circumstances and some of the factors to consider when determining whether extraordinary circumstances are present. Thus, to the extent that the Legislature used the words "extrordinary circumstances" in the KGA, we believe it had extensive common-law antecedents on which it likely relied, as Judge Alarid points out with his reference to the *Morrison* case.

**{28}**    To the extent that we wrote in *Ashleigh* that extraordinary circumstances should be equated with "'grave reasons' approaching, but not necessarily reaching, those required for termination of parental rights," 2002-NMCA-103, ¶ 25 (citation omitted), this statement was not meant to be a holding, and was instead meant to convey to the trial courts the seriousness of the proceeding. To be sure, a guardianship does not have the finality of a termination of parental rights. *See* §§ 40-10B-12 (indicating that guardianship is not irrevocable); -13(B) (authorizing the district court to order that a parent retain certain rights and duties); -14 (providing for continuing jurisdiction). Nonetheless, a guardianship, particularly the one ordered in this case, represents very serious consequences for the parent. Accordingly, our holding in *Ashleigh* was that an order of guardianship of this sort would require proof of "a substantial likelihood of serious physical or psychological harm or serious detriment to the child." 2002-NMCA-103, ¶ 25 (internal quotation marks and citations omitted).

**{29}**    The district court was aware of the *Ashleigh* case and considered that case in making its findings. While characterizing this case as close, the district court ultimately made the findings that resulted in the conclusion that *Ashleigh* was satisfied. Since much of Mother's argument against those findings and that conclusion depends on an erroneous view of the evidence in this case, we may disregard much of Mother's argument. Under the circumstances where Mother left Child with Petitioners, leading to full-time care, for three years and told them the placement would be permanent and they could adopt Child; where Child was primarily bonded to Petitioners as her parents and would suffer significant depression and thereby a substantial likelihood of serious harm and detriment; and where Father consented to the guardianship and testified in such a way that the district court could have found that these proceedings would be only the beginning of custody proceedings concerning Child if the guardianship were not awarded, we hold that the district court properly awarded the guardianship.

**{30}**    As a result, we need not reach the issues of whether the KGA presents a different standard of extraordinary circumstance for guardianships of lesser intrusiveness on parental rights, what constitutional standards apply (particularly inasmuch as the lead opinion notes that it is not reaching constitutional issues, *supra* n.1), and to what extent the doctrine of psychological parentage impacts cases that are not before us. Judge Alarid's views on these matters may well be adopted some day. But they are not necessary to discuss in this case, and we do not join in those views.

**{31}**    For these reasons, we agree that the judgment should be affirmed.

17

                               **LYNN PICKARD, Judge**

**I CONCUR:**

**JONATHAN B. SUTIN, Chief Judge**

Topics for *Debbie L. v. Galadriel R.*, No. 27,101

**CD**          **Children**
CD-KG      Kinship Guardianship
CD-TR      Termination of Parental Rights

**EV**           **Evidence**
EV-SS      Substantial or Sufficient Evidence