**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2015-NMCA-088**

**Filing Date: June 22, 2015**

**Docket No. 33,409**

**STATE OF NEW MEXICO, ex rel.,**
**CHILDREN, YOUTH AND FAMILIES**
**DEPARTMENT,**

       **Petitioner-Appellee,**

**v.**

**CASEY J.,**

       **Respondent-Appellant,**

**IN THE MATTER OF TICHELLE J.,**
**RAZIEL J., and CALEB J.,**

       **Children.**

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**William E. Parnall, District Judge**

Children, Youth & Families Department
Charles E. Neelley, Jr., Chief Children's Court Attorney
Rebecca J. Liggett, Assistant Children's Court Attorney
Santa Fe, NM

for Appellee

Casey Jim
Farmington, NM

Pro Se Appellant

W. Karen Cantrell
Placitas, NM

Guardian Ad Litem

1

**OPINION**

**ZAMORA, Judge.**

**{1}**     Casey J. (Father) appeals the termination of his parental rights to T.J., R.J., and C.J. (Children) not for purposes of restoring his parental rights in the Children, but rather to require the Children, Youth and Families Department (the Department) to place Children with a specific relative, or alternatively any interested relative. Father argues that the Department failed to comply with New Mexico's Abuse and Neglect Act, NMSA 1978, §§ 32A-4-1 to -34 (1993, as amended through 2014), and the federal Indian Child Welfare Act (the ICWA), 25 U.S.C. §§ 1901 to 1963 (2013), with regard to the placement of Children. Father also argues that he was denied due process as well as a fair and impartial termination proceeding. We hold that the Department's placement of Children complied with the state and federal requirements. As to the termination proceedings, we hold that Father was afforded due process, and was not deprived of fair and impartial proceedings. Accordingly, we affirm.

**BACKGROUND**

**{2}**     The Department filed a neglect/abuse petition against Father and Andrea T. (Mother) regarding Children. The Department took Children into custody in February 2011 due to ongoing concerns related to each parent's issues with substance abuse and domestic violence. At the time Children were taken into custody, Father was incarcerated. The district court held a custody hearing on March 1, 2011. The district court found that the ICWA applied because Father, Mother, and Children are all registered members of the Navajo Nation.

**{3}**     At the adjudicatory/dispositional hearing on April 6, 2011, both Father and Mother entered pleas of no contest to the allegations in the neglect/abuse petition, pursuant to Section 32A-4-2(E)(2). The court adopted treatment plans for both parents, designed to address the domestic violence and substance abuse issues. The treatment plans also required supervised visitation and regular communication with the Department.

**{4}**     Father was incarcerated sporadically throughout the pendency of the case. Father attended most of the monthly meetings with the Department permanency planning worker when he was not incarcerated, but did not complete parenting training, domestic violence or substance abuse counseling, and was twice discharged for noncompliance. Father was inconsistent in his visits with Children and his last visit with Children was June 29, 2012. After the June 29, 2012 visit, Father called for a few weeks with excuses for missing visits and after that the Department permanency planning worker did not hear from Father again.

**{5}**     On January 31, 2013, the Department filed a motion for termination of parental rights of Mother and Father, both members of the Navajo Nation. On April 24, 2013, Mother voluntarily relinquished her parental rights. The case proceeded to trial. Father was present,

2

but did not challenge the evidence that he had failed to participate in his treatment plan and that he had abandoned Children. Father did challenge the compliance of Children's foster placements with the requirements of the ICWA. However, Father argued that the Department's failure to place Children according to the ICWA's placement preferences constituted a failure to make active efforts to prevent the breakup of the Indian family, as required by the ICWA.

**{6}** At the conclusion of the termination of parental rights trial, the district court announced its decision indicating it was granting the Department's motion to terminate Father's parental rights. Father filed a motion for reconsideration, which was heard on August 1, 2013. On October 29, 2013, the district court entered a judgment terminating Father's parental rights to Children. This appeal followed.

**DISCUSSION**

**{7}** Father makes a number of arguments in support of reversal for purposes of mandating a relative placement for Children and not the restoration of his parental rights. The majority of these arguments relate to the fact that Children were never placed in foster care with relatives, members of the Navajo Nation, or other Indian families. Father argues that the Department failed to make active efforts to prevent the breakup of the Indian family and to comply with the relative placement preferences under the ICWA and the New Mexico Abuse and Neglect Act. Father also contends that in the absence of full compliance with the placement preferences, he was denied due process of law.

**{8}** To the extent that any of Father's claims relate to the current placement of Children, we decline to address them. Father may not challenge the placement of Children after the termination. *See* § 32A-4-29(L) ("A judgment of the court terminating parental rights divests the parent of all legal rights and privileges."). Accordingly, our analysis of Father's claims is limited to the foster care placement of Children prior to the termination of Father's parental rights.

**Children's Placement Under the ICWA and the New Mexico Abuse and Neglect Act**

**{9}** Interpretation of the ICWA and the New Mexico Abuse and Neglect Act presents questions of law that we review de novo. *State ex rel. Children, Youth & Families Dep't v. Marsalee P.*, 2013-NMCA-062, ¶ 12, 302 P.3d 761. "[The] ICWA is a remedial statute in that it was enacted to stem the alarmingly high percentage of Indian families being separated by removal of children through custody proceedings[,]" and we therefore construe it liberally in order to effectuate its purpose. *State ex rel. Children, Youth & Families Dep't v. Marlene C.*, 2011-NMSC-005, ¶ 17, 149 N.M. 315, 248 P.3d 863 (internal quotation marks and citation omitted).

**{10}** The ICWA was enacted to address the consequences of abusive child welfare practices that separated Indian children from their families and tribes through adoption or

foster care placement, usually in non-Indian homes. *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 32-33 (1989). The stated purpose of the ICWA is

> to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs.

25 U.S.C. § 1902. The overarching concern of Congress and the proponents of the ICWA, was the maintenance of the family and tribal relationships existing in Indian homes. *Holyfield*, 490 U.S. at 37.

> One of the most serious failings of the present system is that Indian children are removed from the custody of their natural parents by nontribal government authorities who have no basis for intelligently evaluating the cultural and social premises underlying Indian home life and childrearing. Many of the individuals who decide the fate of our children are at best ignorant of our cultural values, and at worst contemptful of the Indian way and convinced that removal, usually to a non-Indian household or institution, can only benefit an Indian child.

*Id.* at 34-35 (internal quotation marks and citation omitted). At the core of the ICWA is the tribal interest in the impact that the large numbers of adoptions of Indian children by non-Indians have on the tribes themselves. *Id.* at 49-52. The ICWA "recognizes that the tribe has an interest in the child which is distinct from but on a parity with the interest of the parents." *Id.* at 52 (internal quotation marks and citation omitted).

{11}   The ICWA establishes federal standards for state-court child custody proceedings involving Indian children. *Id.* at 36-37. As relevant here, the ICWA conditions involuntary termination of parental rights with respect to Indian children on a showing that active efforts have been made to prevent the "breakup of the Indian family," 25 U.S.C. § 1912(d); and provides preferences for the foster care placement of Indian children with a member of the Indian child's extended family; a foster care home licensed, approved and specified by the Indian child's tribe; an Indian foster care home licensed or approved by an authorized non-Indian licensing authority; or an institution for children approved by the Indian child's tribe or operated by an Indian organization that has a program suitable to meet the Indian child's needs. 25 U.S.C. § 1915(b). The New Mexico Abuse and Neglect Act has incorporated the ICWA's placement preferences. *See* NMSA 1978, § 32A-4-9(A) (1993).

**Active Efforts Designed to Prevent the Breakup of the Indian Family**

{12}   Father contends that the Department did not make active efforts to prevent the

breakup of his family because Children were not placed with relatives and because Children were not always placed together in one foster home. We understand the basis of Father's argument to be the requirements for preservation of the Indian family as set forth in 25 U.S.C. § 1912(d).

**{13}**    Section 1912(d) of the ICWA provides that a party seeking to terminate parental rights to an Indian child under state law "shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." *Adoptive Couple v. Baby Girl*, ___U.S. ___, ___,133 S. Ct. 2552, 2562 (2013) (emphasis, internal quotation marks  and citation omitted). Efforts to provide remedial services under this section are intended to "alleviate the need to remove the Indian child from his or her parents or Indian custodians." *Id.* at 2563 (internal quotation marks and citation omitted).

**{14}**    Section 1912(d) of the ICWA should be read in harmony with "§ 1912(e) and § 1912(f), both of which condition the outcome of proceedings on the merits of an Indian child's 'continued custody' with his parent." *Adoptive Couple*, 133 S. Ct. at 2563. Thus, 25 U.S.C. § 1912(d) requires that Indian parents be "provided with access to remedial services and rehabilitative programs . . . so that their custody might be continued in a way that avoids foster-care placement under § 1912(e) or termination of parental rights under § 1912(f)." *Adoptive Couple*, 133 S. Ct. at 2563 (internal quotation marks omitted). "[T]he provision of remedial services and rehabilitative programs under § 1912(d) supports the continued custody that is protected by § 1912(e) and § 1912(f)." *Adoptive Couple*, 133 S. Ct. at 2563 (internal quotation marks omitted).  It does not apply to facilitate the placement of the child in compliance with the placement preferences listed in § 1915. *Adoptive Couple*, 133 S. Ct. at 2558.

**{15}**    Here, Father's argument is focused on Children's foster placements throughout the case, not on the Department's efforts to prevent a disruption in custody or parental rights as contemplated by 25 U.S.C. § 1915(d). Father does not address the Department's efforts to provide him with remedial services and rehabilitative programs prior to the removal of Children from the home, or the Department's efforts to engage him in such services and programs through his treatment plan. As a result, whether the Department made active efforts to prevent the breakup of the Indian family, as required by 25 U.S.C. § 1912(d), is not an issue in this appeal. *See In re Doe*, 1982-NMSC-099, ¶ 3, 98 N.M. 540, 650 P.2d 824 (recognizing that appellate courts should not reach issues not raised by the parties). Our relevant inquiry is whether the ICWA placement preferences were followed, and if not, whether good cause existed to deviate from them.

**The ICWA Placement Preferences**

**{16}**    The ICWA and the New Mexico Abuse and Neglect Act specify that, absent good cause to the contrary, foster care placement shall be with: "[(1)] a member of the Indian child's extended family; [(2)] a foster home licensed, approved, or specified by the Indian

child's tribe; [(3)] an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or [(4)] an institution for [the] children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs." *See* 25 U.S.C. § 1915(b); Section 32A-4-9(A). The party seeking to deviate from the placement preferences bears the burden of establishing the existence of good cause to do so. Bureau of Indian Affairs, Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67584, 67594 (Nov. 26, 1979). In determining whether good cause exists for deviating from the placement preferences, a court is required to examine the reasons for deviation in light of "the prevailing social and cultural standards of the Indian community." 25 U.S.C. § 1915(d). The recently issued Bureau of Indian Affairs Guidelines (BIA Guidelines) recognize that any party may raise the issue of whether good cause not to follow the ICWA placement preferences exists. 80 Fed. Reg. 10150, § F(4) (February 25, 2015).

{17}    In this case, the district court found that good cause to deviate from the ICWA placement preferences existed, beyond a reasonable doubt. This standard applies to termination of parental rights under the ICWA. *See* 25 U.S.C. § 1912(f) ("No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."). However, neither 25 U.S.C. § 1915(b) nor Section 32A-4-9(A) of the Abuse and Neglect Act identify a standard of proof for the good cause exception to the placement preferences identified in the statute. We are also unaware of any New Mexico case law that has established a standard as it relates to the good cause exception. We need not decide on a standard for two reasons. First, the issue is not squarely before us as neither party has raised the issue. *See In re Doe*, 1982-NMSC-099, ¶ 3 (recognizing that appellate courts should not reach issues not raised by the parties). Second, under the facts of this case, we conclude that the district court's findings of good cause to deviate from the ICWA placement preferences are appropriate whether the burden of proof was preponderance of the evidence, clear and convincing, or beyond a reasonable doubt.

**Deviation From The Placement Preferences Was Supported by Good Cause**

{18}    Father argues that the district court's determination that good cause existed to deviate from the ICWA placement preferences was not supported by the evidence. The ICWA does not define "good cause." However, the BIA Guidelines for state courts to use in Indian child custody proceedings provide that a determination of good cause not to follow the placement preferences should be based on one or more of the following considerations: a "request of the biological parents or the child when the child is of sufficient age"; the "extraordinary physical or emotional needs of the child as established by testimony of a qualified expert witness"; and the "unavailability of suitable families for placement after a diligent search has been completed for families meeting the preference criteria." Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. at 67,594.

**{19}** There are some courts that limit their good cause analysis to the considerations listed in the BIA Guidelines. *See In re Custody of S.E.G.*, 521 N.W.2d 357, 362 (Minn. 1994) (stating that simply applying the best interests standard is contrary to the plain language of the ICWA read as a whole, and to its legislative history); *see also In re Adoption of Riffle*, 922 P.2d 510, 514 (Mont. 1996) (deciding it is improper to apply best interest when determining good cause because the ICWA expresses presumption that it is in the Indian child's best interest to be placed in conformance with the preferences).

**{20}** Other courts have held that the considerations listed in the BIA Guidelines are not exhaustive. *See In re Adoption of M.*, 832 P.2d 518, 522 (Wash. Ct. App. 1992) ("Good cause is a matter of discretion, and discretion must be exercised in light of many factors. These include but are not necessarily limited to the best interests of the child, the wishes of the biological parents, the suitability of persons preferred for placement, the child's ties to the tribe, and the child's ability to make any cultural adjustments necessitated by a particular placement." (citations omitted)); *see also In re Adoption of F.H.*, 851 P.2d 1361, 1363-64 (Alaska 1993) ("Whether there is good cause to deviate in a particular case depends on many factors including, but not necessarily limited to, the best interests of the child, the wishes of the biological parents, the suitability of persons preferred for placement and the child's ties to the tribe.").

**{21}** NMSA 1978, § 32A-1-3(A), (B) (2009) provide, in pertinent part, that the Children's Code shall be interpreted and construed to effectuate the following legislative purposes:

> A.    *[F]irst* to provide for the care, protection and wholesome mental and physical development of children coming within the provisions of the Children's Code *and then* to preserve the unity of the family whenever possible. *A child's health and safety shall be the paramount concern.* Permanent separation of a child from the child's family, however, would especially be considered when the child or another child of the parent has suffered permanent or severe injury or repeated abuse. It is the intent of the [L]egislature that, to the maximum extent possible, children in New Mexico shall be reared as members of a family unit;
>
> B.    [T]o provide judicial and other procedures through which the provisions of the Children's Code are executed and enforced and in which *the parties are assured a fair hearing and their constitutional and other legal rights are recognized and enforced*[.]

(Emphasis added.) Thus, in determining the existence of good cause to deviate from the ICWA placement preferences, the court must give primary consideration to the children's best interests, but must ensure that the constitutional and other legal rights of all the parties are considered.

**{22}** We recognize that parents have a "fundamental liberty interest in the care, custody, and management of their children." *State ex rel. Children, Youth & Families Dep't v. Amanda M.*, 2006-NMCA-133, ¶ 18, 140 N.M. 578, 144 P.3d 137. Parents also have a right to pursue familial relationships with their children. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 618-20 (1984) (holding that familial associations are included in the fundamental right to freedom of association); *see also Lucero v. Salazar*, 1994-NMCA-066, ¶¶ 6-9, 117 N.M. 803, 877 P.2d 1106 (recognizing the fundamental right of familial association or right to intimate familial relationship). As discussed above, the Indian tribe has an interest in Indian children that is in parity with that of the parents. *Holyfield*, 490 U.S. at 52.

**{23}** However, it is well established that these rights are not absolute; rather, they must yield to the "best interests and welfare of the children." *State ex rel. Children, Youth & Families Dep't v. John R.*, 2009-NMCA-025, ¶ 27, 145 N.M. 636, 203 P.3d 167 (internal quotation marks and citation omitted). In assessing the children's best interests, it is imperative that the children are recognized as people who have fundamental interests of their own that are constitutionally protected. *See In re Gault*, 387 U.S. 1, 13, (1967) (holding that the Fourteenth Amendment and the Bill of Rights apply to children.); *see also In re Guardianship of Victoria R.*, 2009-NMCA-007, ¶ 11, 145 N.M. 500, 201 P.3d 169 (stating that a child is a person for purposes of the Fourteenth Amendment). The children have the fundamental right to be protected from abuse and neglect, and to have a permanent and stable placement. *Id.* They "are not simply chattels belonging to the parent, but have fundamental interests of their own that may diverge from the interests of the parent." *Id.* (internal quotation marks and citation omitted).

## Standard of Review for Good Cause Determinations

**{24}** The determination of good cause to deviate from the ICWA placement preferences is a legal standard. *See Dep't of Human Servs. v. Three Affiliated Tribes of Fort Berthold Reservation*, 238 P.3d 40, 50 (Or. Ct. App. 2010). Accordingly, "we must determine whether the facts, as found by the trial court and as supported by evidence in the record, are legally sufficient to establish 'good cause' to depart from [the] ICWA's placement preferences." *Id.* "On appeal, this Court does not re-weigh the evidence, rather, we view the evidence in the light most favorable to the prevailing party." *State ex rel. Children, Youth & Families Dep't v. Jerry K.*, 2015-NMCA-047, ¶ 24, ___P.3d___. "Our overarching goal when interpreting the ICWA is to effectuate Congress's intent." *Marlene C.*, 2011-NMSC-005, ¶ 15.

## The District Court's Findings of Good Cause

**{25}** The district court heard evidence related to Children's placement at the adjudicatory/dispositional hearing, the initial judicial review hearing, five permanency hearings, the termination of parental rights trial, and the hearing on Father's motion to reconsider. The district court consistently found that good cause existed to deviate from the ICWA's placement preferences.

8

**The Adjudication and the Initial Judicial Review**

**{26}** The adjudicatory/dispositional hearing was held on April 6, 2011. The ICWA qualified expert witness (QEW) working for the Navajo Nation Children and Family Services testified that she was aware of Children's current placements and that the placements did not meet the ICWA placement preferences, but that good cause existed to deviate from the preferences. The district court found that the ICWA placement preferences had not been followed because the Department had been unable to find an ICWA approved home, and that the Department was working with the Navajo Nation to determine an appropriate relative placement.

**{27}** The testimony of the QEW, that good cause existed to deviate from the ICWA placement preferences, was sufficient to meet any standard. Under the ICWA, no foster care placement for an Indian child may be ordered "in the absence of a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." § 1912 (e). The best interests of Indian children will often be directly linked to their tribal culture. Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. at 67593. The purpose of the QEW is to provide testimony related to the Indian child's best interests from the perspective of someone with expert knowledge of tribal culture and childrearing practices. *Id.*

**{28}** In this case, the QEW was a social worker for the Navajo Nation Children and Family Services who had been employed with the Navajo Nation for over a year-and-a-half, and who was knowledgeable about the provisions of the ICWA. The QEW explained that she was knowledgeable about the practices and traditions of the Navajo Nation as a registered member of the tribe and as an active participant in the Navajo practices and traditions. The district court did not err in relying on her testimony that, at the time of the adjudicatory/dispositional hearing, good cause existed to deviate from the ICWA placement preferences.

**{29}** On June 3, 2011, the district court held an initial judicial review hearing. Information was presented that the Department was not able to find a placement for Children together. Children were placed in two separate foster homes and were visiting with each other. The Department was working with Mother, Father, and the Navajo Nation to determine an appropriate placement. The QEW testified that the Department was looking at two relatives, who did not live on the reservation, for possible placement. The Department permanency planning worker explained that three relatives had come forward: (1) a member of the Zia Pueblo, but the Zia Pueblo would not allow the Department to conduct a home study because Children were not Zia members; (2) Children's paternal uncle who withdrew for health reasons; and (3) a paternal aunt, Bernice Strait (Aunt), for whom the Department was working on approval to go forward with the home study process.

**{30}** The district court encouraged the Department and the QEW to stay in touch and work out a suitable placement. The QEW did not identify any special needs of Children, and stated her approval of Children's placement. The district court found that, at that time, there was good cause not to follow the ICWA placement preferences.

**{31}** In light of the Department's efforts to find relative placements for Children, the unavailability of ICWA-compliant placements, and the QEW's approval and statement of good cause, we conclude that the district court did not err in determining that good cause existed to deviate from the ICWA placement preferences at the time of the initial judicial review.

**The Permanency Hearings**

**{32}** The initial permanency hearing was held on November 30, 2011. The Department reported that it was continuing to look for a placement that met the ICWA placement preferences and was working with the Navajo Nation to identify an appropriate relative. The Guardian Ad Litem (GAL) testified that Children were doing well in their respective foster homes, but that when there was visitation, there was some troublesome sibling interaction that may need to be dealt with therapeutically.

**{33}** The CASA volunteer, who was a member of the Navajo Nation, reported that she was helping to foster Children's cultural connections. She stated that she was able to provide Children with traditional outfits including jewelry and moccasins, and that she was helping out with T.J.'s coming of age ceremony, which was a big part of T.J's life. The Department indicated that Aunt had a good relationship with Children, and that she had been very supportive and had been visiting them. The Department also reported that Aunt had provided traditional items for Children to wear on feast days, which was very meaningful to Children.

**{34}** A new social worker from the Navajo Nation, also admitted as a QEW, had been assigned to the case. She requested that Mother and Father provide names of relatives on the reservation for consideration as potential placements for Children. Mother and Father were present and both indicated that they wanted Children to be placed with Aunt. The Department explained that a home study was started with Aunt, but that Aunt had withdrawn from consideration because she was caring for her mother. However, at the time of the hearing, Aunt was again expressing an interest in having Children placed with her and the Department was pursuing that placement. The court stated its support for pursuing and finalizing placement of Children with Aunt. The Navajo Nation did not object to Aunt as a possible placement.

**{35}** In its first permanency hearing order, the district court found that the ICWA placement preferences were not being followed because the Department had been unable to locate an ICWA approved home. However, the court also found that the Department was working with the Navajo Nation to determine an appropriate relative placement, and that the Department was working with the Navajo Nation and the family to preserve and maintain

10

Children's cultural connection. The evidence presented at the first permanency hearing showed that the Department was actively pursuing relative placement options for Children, and that placement in accordance with the ICWA had not yet been possible due to the unwillingness or unavailability of relative placements. The Department also showed that it was making efforts toward addressing the special needs of Children and promoting their connections with their heritage. Father's request, that Aunt be considered as a placement option, was being actively pursued by the Department. We conclude that the district court did not err in finding there was good cause to deviate from the ICWA placement preferences at the first permanency hearing.

{36}    A second permanency hearing was held on February 22, 2012. Father was not present. Father's attorney could not reach Father and did not know his location. At the February 2012 hearing, it was reported that Children were doing relatively well in their current placements. R.J. and C.J. were receiving speech and language therapy. No other special needs were identified.

{37}    It was also reported that Aunt had again withdrawn from the home study process and the Department had been actively trying to find other relatives. The permanency planning worker stated that she had requested names of relatives from Father, Mother, and Aunt, and had even asked Children if there were relatives that they would like to see more often. The relatives that had been considered for placement at the time of the hearing had been ineligible due to their backgrounds.

{38}    When asked, the QEW indicated that she did not believe there was ever good cause to deviate from the ICWA placement preferences, but that she understood that the Department could not find Navajo or Native American foster homes for Children. The Department indicated that it would accept help from the Navajo Nation in locating potential relative or Navajo placements for Children. The district court asked the Navajo Nation to assist the Department in finding a suitable ICWA placement. The district court found that good cause existed to deviate from the ICWA placement preferences, and encouraged the Navajo Nation and the Department to work together in finding a suitable, ICWA-compliant placement for Children.

{39}    The evidence presented at the second permanency hearing showed the unavailability of suitable relatives, Navajo, or other Native American placements. The absence of appropriate ICWA approved placements, along with the continued efforts by the Department and the Navajo Nation, constituted good cause to deviate from the ICWA placement preferences. Additionally, there was no indication by the GAL or the Navajo Nation that Children's needs were not being met in their placements at that time. We conclude the district court did not err in finding good cause to deviate from the placement preferences at the second permanency hearing.

{40}    A third permanency hearing was held on August 20, 2012. Father was not present and his attorney was unable to contact or locate him. The Department reported that Children

were all placed together in a new foster placement. The new placement was not an adoptive home for Children and the Department indicated that it wanted to get Children free for adoption so that the Department could start the adoption recruitment effort. The GAL reported that Children were doing well in the new placement where they were all together. She also stated Children were involved in therapy and with cultural activities through the Native American Community Academy (NACA), where T.J. attended school.

**{41}** The Department reported that it had located some paternal relatives that were willing to be considered for placement, but they had withdrawn from the home study process because it was too invasive. The permanency planning worker then explained that several relatives had been located for possible placement but that none wanted to step forward because they were fearful of Father and Mother. She also explained that the Department had considered Aunt as a placement three times, and Father's brother had also indicated that he would be a placement option, but twice withdrew. The Department also informed the court that it had maintained contact with Aunt and that Aunt had provided the name of a third cousin that the Department could contact regarding placement. The Department had also asked Aunt to look into clan members that may provide potential placements.

**{42}** The Department asked for assistance from the Navajo Nation in locating potential Navajo placements. The QEW indicated that she still needed to rule out any proposed placements by their adoption unit and requested a photograph and profile of Children so that a request for certified homes to consider placement of Children could be made.

**{43}** The district court found that the ICWA placement preferences had not been followed; however, "good cause exist[ed] for deviating from the . . . placement preferences because no relative, no Navajo, and no Indian homes [had] been identified and approved for placement." The court further found that the "Department [was,] through its treatment plan, . . . ensuring that [C]hildren's cultural ties [were] being protected and fostered."

**{44}** The Department's inability to place Children in compliance with the ICWA placement preferences stemmed primarily from the unavailability of suitable families for placement. There was no testimony to indicate Children had special needs that were unmet in their current placement. We also note that there was no objection to the placement by the parents or the Navajo Nation. We conclude that the district court appropriately found that there was good cause to deviate from the placement preferences at the third permanency hearing.

**{45}** On February 19, 2013, a fourth permanency hearing was held. Father was not present and his attorney was unable to locate him. At that hearing, the Department reported that R.J. and C.J. had been placed in treatment foster care because they needed a higher level of care. The Department also indicated that it had been unsuccessful in finding and qualifying a suitable relative or Native American placement for Children. The GAL reported that R.J. and C.J. had experienced significant and troubling behaviors that necessitated their transition to a treatment foster care facility. She informed the court that T.J. remained placed in her

original foster home and that she was doing well in that placement and at school where her cultural ties were being protected and fostered.

{46}    The district court asked the QEW what the Navajo Nation's position was on the efforts of the Department and on whether good cause existed to deviate from the ICWA placement preferences. The QEW stated that the Navajo Nation supported the Department's efforts to find permanency for Children; however, the Navajo Nation was still looking for possible relative placements on the reservation, and that a referral had been made to the Navajo Nation's adoption unit. The Navajo Nation had given approval for the Department to conduct a nationwide search for an ICWA preferred home suitable for permanent placement.

{47}    The district court found that the Department had made active efforts to comply with the ICWA placement preferences, that the Department had proven beyond a reasonable doubt that good cause existed to deviate from the preferences, and that the Navajo Nation concurred with the placement under the circumstances. The Department's inability to place Children in compliance with the ICWA placement preferences stemmed primarily from the unavailability of suitable families for placement. There was no testimony to indicate Children had special needs that were unmet in their current placement. We also note that there was no objection to the placement by the parents or the Navajo Nation. We conclude that the district court appropriately found that there was good cause to deviate from the placement preferences at the fourth permanency hearing.

**The Termination of Parental Rights Trial**

{48}    The termination of parental rights trial was held over three days:  April 1, 2013, April 24, 2013, and May 17, 2013. On April 24, 2013, Mother relinquished her parental rights and the trial proceeded as to Father's rights. At the trial, the Department permanency planning worker reported that T.J. was thriving in the home where she was placed, that she was excelling in school and was involved in extracurricular activities, but that R.J. and C.J. were experiencing behavioral difficulties and had been placed in treatment foster care. The permanency planning worker also reported that Children were maintaining their cultural ties, T.J. was attending NACA and was involved in their dance club, and the treatment foster parents were reading books to R.J. and C.J. to help them learn about their culture.

{49}    The permanency planning worker testified that she had maintained contact with the Navajo Nation with regard to Children's placements. She stated that the Department had continued its efforts to identify and locate suitable homes for placement, but that the relatives who had been identified as of the date of the termination hearings had been unwilling or unable to provide a suitable placement for Children. She explained that home studies had been initiated with relatives; however, the relatives had withdrawn from the process. The permanency planning worker reported that no Navajo or other Native American placements had been identified but that the Department was continuing to work with the Navajo Nation to locate other relatives or potential placements.

13

**{50}** A Department employee, who assisted Aunt during the home study process, testified about the Department's attempts to license Aunt as a foster placement for Children. In June 2011 Aunt contacted the Department to be considered as a potential placement. Aunt completed the Relative, Adoptive, Foster Parent Training (RAFT), a four day training class required for foster placement licensing. The Department requires foster parents and members of foster families over the age of seventeen to complete RAFT training as part of the home study process. The Department initiated a home study; however, Aunt's mother became very ill and Aunt withdrew from the process in August 2011. At that time interviews with family members, which were needed to complete the home study, had not been conducted.

**{51}** Aunt contacted the Department again in December 2011 and the Department started the home study process again. In February 2012, Aunt's mother was hospitalized and Aunt withdrew from consideration as a placement for Children in order to care for her. In November 2012, Aunt contacted the Department and asked to be considered a third time. The Department advised Aunt that her son would be interviewed and required to participate in the RAFT training. Aunt informed the Department that her son would not cooperate.

**{52}** On November 26, 2012, the Department sent Aunt a letter advising that the requested interviews and RAFT training were required by policy, and requested that Aunt contact the Department by December 3, 2012, to confirm her son's participation and avoid Aunt being withdrawn from consideration a third time. Aunt called the Department and stated that her son would attend RAFT training scheduled for December 1, 2012; however, her son did not attend the training. Aunt later reported to the Department that her son would not cooperate either with an interview or with the training. The Department informed Aunt that it would have to withdraw Aunt from consideration again.

**{53}** The Department's home study worker explained that the purpose of the home study is to make sure that Children are placed in a safe home and that the people in the home are able to handle Children's behaviors and provide a safe and nurturing environment. She stated that the son's participation was a critical part of the home study because he would share a room with R.J. and C.J., who had been traumatized, and the son needed to know how to interact with Children efficiently and helpfully. According to the home study worker, the son had not lived with small children in the home before and the Department wanted to equip him with skills that would help him interact with Children.

**{54}** Aunt was present and testified at the termination trial. She stated that when she withdrew from consideration the third time, interviews with the members of her household had not yet been completed, there had not been a report from her son's school, and she had not provided the Department with copies of her income tax documents as requested. However, Aunt indicated that she was still willing to provide a home for Children and that her son was now willing to take the required classes.

**{55}** The QEW also testified at the termination trial. She stated that the Navajo Nation was in support of the termination of parental rights because Father had not been able to complete

14

his service plan and had not demonstrated that he was able to parent Children without substance abuse or domestic violence, neither of which was acceptable in the Navajo culture. The QEW testified that returning Children to Father would result in serious emotional or physical harm to Children and that Children, who had been in custody for about two years, needed permanency.

**{56}**    As to Children's placement, the QEW reported that the Department conferred with the Navajo Nation when it was changing Children's temporary placement, and that the Navajo Nation approved Children's temporary placements because the Department did not have an ICWA-compliant placement. The QEW testified that she was aware of the Department's efforts to qualify Aunt as a relative placement for Children. It was her understanding that the last time Aunt was being considered as a relative placement, she did not want to take all three Children, only T.J. She also reported that the Navajo Nation attempted to find a family for placement, but that possible placements were too far from Father and Mother to allow them to maintain a parent-child relationship with Children.

**{57}**    The QEW further testified that the Department had made active efforts to locate other Navajo and other Native American families for temporary placement, and that the Navajo Nation believed that there was good cause to deviate from the ICWA preferences for Children's temporary placements. She also reported that the Navajo Nation had given approval to open up a nationwide search for an ICWA preferred home suitable for permanent placement.

**{58}**    The district court announced that it would grant the Department's motion to terminate Father's parental rights. The court pointed out that since the Navajo Nation had not yet approved a final, adoptive placement for Children, the issue of placement of Children was ongoing and Aunt was still a potential placement.

**Motion for Reconsideration**

**{59}**    Father filed a motion to reconsider ruling on May 28, 2013, and the hearing on that motion was held on August 1, 2013. Father argued that it was a violation of his due process rights to allow the Department's policy that seventeen-year-olds take the foster parent classes to override the ICWA's active efforts requirement to not break up the family, which included extended family. The district court denied Father's motion based on the information and testimony in the record, including the testimony of the QEW that the Department had made active efforts to prevent the breakup of the Indian family.

**{60}**    The court asked the Department to make efforts to help Aunt comply with the licensing requirements and to actively engage Aunt's son to participate in the classes. The Department indicated that after the May 17, 2013, hearing, the Department had been attempting to re-engage Aunt in the process and that they had been unable to reach her, but that the door was definitely open.

15

**The Fifth Permanency Hearing**

**{61}**  On August 26, 2013, the court held a fifth permanency hearing. We consider the district court's determination of good cause to deviate from the ICWA placement preferences at this hearing because at the time, Father's parental rights had not yet been terminated. Although the district court had announced its intention to grant the Department's motion to terminate Father's parental rights at the conclusion of the termination trial in May 2013, Father was not divested of his parental rights, and thereby his interest in Children's placement, until the district court's judgment terminating Father's parental rights was filed in October 2013. *See State v. Lohberger*, 2008-NMSC-033, ¶ 20, 144 N.M. 297, 187 P.3d 162 ("Informal expressions of a court's rulings are not appealable final orders or judgments. For example, a trial court's oral announcement of a result is not final, and parties to the case should have no reasonable expectation of its finality."); *see also Bouldin v. Bruce M. Bernard, Inc.*, 1967-NMSC-155, ¶ 3, 78 N.M. 188, 429 P.2d 647 ("[A]n oral ruling by the trial judge is not a final judgment. It is merely evidence of what the court had decided to do—a decision that the trial court can change at any time before the entry of a final judgment.").

**{62}**  At the fifth permanency hearing, the Department reported that T.J. was doing well in her foster placement, and that R.J. and C.J. continued to require treatment foster care as well as intensive therapeutic treatment. The Department also reported that Aunt had been visiting Children, but that she had been telling Children things about their parents that were upsetting Children. The Department informed the court that it had attempted to engage Aunt in a fourth home study, that Aunt had not fully participated in the home study, and that Aunt withdrew from the process a fourth time because she did not feel like it was "fair to her son."

**{63}**  The QEW indicated that she had not ruled out the Navajo Nation's adoption unit as to any potential placements, and that she was exploring Children's maternal relatives for possible placement options. The QEW reported that the Navajo Nation supported Children's current placement where they were receiving treatment for their special needs. The QEW also stated that T.J. has a say in her adoptive placement, and that the QEW supported T.J's decision.

**{64}**  The district court found that the ICWA placement preferences had not been followed; however, good cause existed for deviating from the placement preferences because no relative, no Navajo, and no Indian homes had been identified and approved for placement. We conclude the district court appropriately found there was good cause to deviate from the placement preferences.

**Judgment Terminating Father's Parental Rights**

**{65}**  The district court filed its judgment terminating Father's parental rights on October 29, 2013. In its judgment, the district court found that the Department had made active efforts to comply with the ICWA placement preferences, that the Department had proven

that good cause existed to deviate from the preferences, and that the Navajo Nation concurred with the placement under the circumstances.

**{66}** We conclude that the district court's findings that good cause existed throughout this case to deviate from the ICWA placement preferences were supported by sufficient evidence. As noted earlier, the applicable standard was not before this Court, but the district court's findings would have been appropriate no matter what standard was applied. For purposes of the BIA Guidelines, we note that the Department made consistent efforts to honor Mother's and Father's request that Aunt be considered as a placement for Children; the Department and the Navajo Nation, working in conjunction, were unable to find an available ICWA preferred placement for Children; and the Department demonstrated that Children's cultural, physical, mental, and emotional needs were being addressed through Children's treatment plans, despite the unavailability of ICWA preferred placements.

**{67}** It is also significant that the Navajo Nation did not object to Children's placement at any point during the case. The Navajo Nation never expressed concern that Children's cultural, physical, emotional, and psychological needs were not being met by their treatment plans. It is also significant that the QEW recognized that, with regard to Children's foster care placements, good cause existed to deviate from the ICWA preferred placements.

**Relative Placement Under New Mexico Law**

**{68}** New Mexico law expresses a preference that any child subject to the New Mexico Abuse and Neglect Act be placed with relatives, whether or not the child's case falls under the ICWA. *See* § 32A-4-25.1(D) ("[T]he court shall determine whether the [D]epartment has made reasonable efforts to identify and locate all grandparents and other relatives. The court shall also determine whether the [D]epartment has made reasonable efforts to conduct home studies on any appropriate relative expressing an interest in providing permanency for . . . [Children]. The court must ensure the consideration has been given to . . . [Children]'s familial identity and connections."); *see also* 8.10.3.16(F) NMAC (3/31/2010) (amended 2/29/2012) (the Department "shall make every effort to identify, locate[,] and notify fit and willing relatives for consideration of placement of a child in custody who requires out of home placement"); 8.10.7.17(A) NMAC (3/31/2010) ("[The] department shall exercise due diligence to identify and notify adult relatives of a child's removal within thirty . . . days of the removal. The notice shall inform relatives of their option to become a placement resource for the child.").

**{69}** To the extent that Father argues that the Department failed to make reasonable efforts to identify, locate, and conduct home studies on willing and appropriate relatives who could potentially serve as placement for Children, as required by Section 32A-4-25.1(D) and the related regulations, we conclude the Department's efforts to place Children with relatives, as outlined above, were sufficient to satisfy those requirements.

**Due Process**

17

**{70}** We note that Father does not challenge the sufficiency of the evidence to support the termination of his parental rights. Instead, Father claims that the Department's failure to place Children with relatives or non-relative Indian families violated his substantive and procedural rights to due process. Father argues that his substantive due process rights were violated when the Department failed to place Children with Aunt, in violation of the ICWA, and thus he was deprived of his right to maintain a familial relationship with his children. Father also contends that the district court denied him procedural due process by entering a judgment terminating his parental rights in the absence of full procedural compliance with the placement preferences for Indian children under New Mexico law and the ICWA.

**{71}** Because we have concluded that the district court's findings that good cause existed throughout this case to deviate from the ICWA placement preferences were supported by sufficient evidence, and that the Department's efforts to place Children with relatives were sufficient to satisfy the requirements of the New Mexico Abuse and Neglect Act, Father's substantive due process argument fails.

**{72}** Father further argues that the Department wrongly interfered with Father's pursuit of his familial relationship with Children by failing to make active efforts to place Children with Aunt. Prior to termination of parental rights Father did have a substantive due process right in a relationship with Children. *See Santosky v. Kramer*, 455 U.S. 745, 753 (1982). However, we concluded that whether the Department made active efforts to prevent the breakup of the family is not an issue in this appeal. Consequently, Father's argument fails.

**{73}** Once his parental rights were terminated, he no longer had that legal right to a continuing familial relationship with Children. *See* § 32A-4-29(L) (stating "termina[tion of] parental rights divests the parent of all legal rights and privileges and dispenses with both the necessity for the consent to or receipt of notice of any subsequent adoption proceeding concerning the child[ren]").

**{74}** Father's procedural due process claim is also based on the Department's foster care placement of Children in non-Indian homes. "[P]rocess is due when a proceeding affects or interferes with the parent-child relationship." *State ex rel. Children, Youth & Families Dep't v. Maria C.*, 2004-NMCA-083, ¶ 24, 136 N.M. 53, 94 P.3d 796. Whether a parent was afforded due process in abuse and neglect proceedings is a question we review de novo. *State ex rel. Children, Youth & Families Dep't v. Kathleen D.C.*, 2007-NMSC-018, ¶ 11, 141 N.M. 535, 157 P.3d 714. Procedural due process rights are implicated when a person has been denied "notice and an opportunity to be heard at a meaningful time and in a meaningful manner." *State ex rel. Children, Youth & Families Dep't v. Christopher B.*, 2014-NMCA-016, ¶ 6, 316 P.3d 918 (internal quotation marks and citation omitted). Because Father's claim relied on the Department's placement of Children during the pendency of the neglect proceedings, rather than his notice of and opportunity to participate in the termination proceedings, the argument fails. We hold Father's procedural due process rights were not violated.

18

**Fair and Impartial Proceedings**

**{75}** Father contends that he was denied fair and impartial termination proceedings because the district court judge presiding over Father's termination proceedings failed to recuse himself when Children were placed in the foster home of a judge serving within the same judicial district. Father acknowledges that this issue was not preserved. Nonetheless, Father urges this Court to address the issue, claiming that it affects Father's fundamental right to a fair and impartial hearing. *See* Rule 12-216(B)(2) NMRA ("This rule shall not preclude the appellate court from considering . . . questions involving . . . fundamental error or fundamental rights of a party.").

**{76}** The first step in reviewing for fundamental error is to determine whether an error occurred. *Campos v. Bravo*, 2007-NMSC-021, ¶ 8, 141 N.M. 801, 161 P.3d 846. If error has occurred, we then consider whether the error was fundamental. *Id.* Father bases his claim that he was deprived of fair and impartial proceedings, on Rule 21-211(A) NMRA, which requires that a judge "disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned." *Id.* Father argues that it could appear that the judge presiding over Father's case might consider the impact on his colleague if the district court judge removed Children from the colleague's foster home to place them with Aunt. However, the district court judge typically does not determine placement when a child is in the legal custody of the Department. *See* NMSA 1978, § 32A-1-4(O) (2009) (defining "legal custody" as "a legal status created by order of the court . . . that vests in a person, department or agency the right to determine where and with whom a child shall live" (internal quotation marks omitted)). The suggestion that the district court judge's impartiality could be reasonably questioned, based solely on the fact that he and one of Children's temporary foster parents sat concurrently as judges for the same district, is insufficient to require recusal. *See Roybal v. Morris*, 1983-NMCA-101, ¶ 7, 100 N.M. 305, 669 P.2d 1100 ("Suspicion of bias or prejudice is not enough to disqualify a judge."). We conclude that the district court judge did not err in not recusing himself.

**CONCLUSION**

**{77}** For the foregoing reasons, we affirm.

**{78}** **IT IS SO ORDERED.**

_____
**M. MONICA ZAMORA, Judge**

**I CONCUR:**

_____
**MICHAEL D. BUSTAMANTE, Judge**

**JAMES J. WECHSLER, Judge (specially concurring).**

**WECHSLER, Judge (specially concurring).**

**{79}** I concur in the result of the majority opinion. I write separately because I would take a different path in affirming the district court.

**{80}** The nature of the case on appeal is significant. Father appeals the district court's judgment terminating his parental rights to Children. In his request for relief in his brief in chief, Father specifically asks this Court to reverse the order terminating those rights, in addition to requesting an order requiring the Department to place Children with his relatives. The majority states that Father appealed, not in order to restore his parental rights, but to require the Department to place Children with Aunt or, alternatively, any interested relative. Majority Opinion ¶¶ 1, 7. The majority therefore focuses its analysis on the foster care placement of Children prior to termination of Father's parental rights. Majority Opinion ¶ 8. But regardless of Father's stated purposes that underlie his request as characterized by the majority, I consider Father's appeal to be inextricably linked to the proceeding to terminate his parental rights pursuant to the ICWA.

**{81}** A termination of parental rights proceeding is fundamentally different from a foster care placement proceeding under the ICWA. "Foster care placement" means "any action removing an Indian child from its parent or Indian custodian for temporary placement . . . where the parent or Indian custodian cannot have the child returned upon demand, *but where parental rights have not been terminated*[.]" 25 U.S.C. § 1903(1)(i) (emphasis added). A "termination of parental rights" means "any action resulting in the termination of the parent-child relationship[.]" 25 U.S.C. § 1903(1)(ii) (internal quotation marks omitted). By their own terms, "a foster care placement proceeding seeks to temporarily remove an Indian child from the child's parent or Indian custodian without terminating parental rights, while a termination of parental rights proceeding seeks to end the parent-child relationship." *Thompson v. Fairfax Cnty. Dep't of Family Servs.*, 747 S.E.2d 838, 853 (Va. Ct. App. 2013) (alteration, internal quotation marks, and citation omitted). Father did not seek an interlocutory appeal with regard to any foster care placement of Children. Because Father's appeal arises from a termination of parental rights proceeding, our inquiry into Father's claims must necessarily focus on the allowable grounds upon which Father may invalidate the termination of his parental rights under the ICWA.[1]

---

[1]Father also argues that the Department failed to comply with the Abuse and Neglect Act in its placement of Children, but Father does not raise the question of CYFD's compliance with the Abuse and Neglect Act with regard to the termination of his parental rights. Nevertheless, the Abuse and Neglect Act provides that "[t]he termination of parental rights involving a child subject to the federal [ICWA] shall comply with the requirements of that act." Section 32A-4-28(E).

**{82}** The ICWA contains a statutory provision that provides recourse to a parent whose parental rights to an Indian child have been terminated. That provision states:

> Any Indian child who is the subject of any action for foster care placement or termination of parental rights under [s]tate law, any parent or Indian custodian from whose custody such child was removed, and the Indian child's tribe may petition any court of competent jurisdiction to invalidate such action upon a showing that such action violated any provision of [25 U.S.C. §§] 1911, 1912, and 1913 of this title.

25 U.S.C. § 1914. As a threshold matter, the plain language of this remedial provision only provides a cause of action for violations of three sections of the ICWA. Section 1914 does not allow a parent to challenge a termination of parental rights upon a showing that the termination violated the ICWA's placement preferences enumerated in 25 U.S.C. § 1915. Accordingly, I conclude that 25 U.S.C. § 1914 controls our review of Father's appeal, and we cannot reverse the district court's judgment only upon a showing that Children's foster care placement violated the ICWA's placement preferences. Other jurisdictions have considered this question and also have concluded that the provisions of 25 U.S.C. § 1914 do not apply to violations of Section 1915. *See Doe v. Mann*, 285 F.Supp.2d 1229, 1241 (N.D. Cal. 2003) ("[I]t seems clear from the text of [25 U.S.C. §] 1914 that Congress intended to provide a cause of action only for violations of three ICWA sections."); *see also B.R.T. v. Exec. Dir. of Soc. Serv. Bd.*, 391 N.W.2d 594, 601 (N.D. 1986) (stating that petition or motion challenging "order terminating parental rights . . . is an improper vehicle for challenging the alleged violation of the placement preferences mandated by [25 U.S.C. Section 1915].");  *In the Interest of J.W.*, 528 N.W.2d 657, 662 (Iowa Ct. App. 1995) ("The remedial provisions of [25 U.S.C. §] 1914 do not apply to violations of [25 U.S.C. §] 1915."); *State ex rel. Juvenile Dep't of Multnomah Cnty. v. Woodruff*, 816 P.2d 623, 625 (Or. Ct. App. 1991) ("Failure to comply with the foster care placement preferences in § 1915(b) is not a basis for invalidating a court order terminating parental rights."). Therefore, I disagree with the majority that we can reach the issue of Children's placement in this case.

**{83}** It does seem that, theoretically, Father could have raised the issue of Children's placement under 25 U.S.C. § 1914 by alleging a violation of the "active efforts" requirement outlined in 25 U.S.C. § 1912(d). In other words, Father could have posited that CYFD's failure to follow the ICWA's placement preferences impacted his ability to meet the requirements of the Department's remedial services and rehabilitative programs, thus constituting a failure by CYFD to engage in "active efforts . . . designed to prevent the breakup of the Indian family.]" 25 U.S.C § 1912(d). The district court, in its judgment terminating Father's parental rights, found "that the Department has made active efforts to comply with the preferences . . . [and] the active efforts requirement [of Section 1912(d)] does not apply to extended family[.]" Our courts have not decided whether a failure to engage in "active efforts" may serve as a basis for invalidating a termination of parental rights judgment under the ICWA, but that question is not before us here. Father does not directly attack the district court's finding or raise a specific argument that the "active efforts"

requirement of 25 U.S.C. § 1912(d) applies to both his extended family and compliance with the ICWA's placement preferences pursuant to 25 U.S.C. § 1915. The majority also notes that CYFD's "active efforts" are not at issue in this appeal, albeit for slightly different reasons, because Father did not adequately raise the issue. Majority Opinion ¶ 15.

**{84}** Accordingly, for the foregoing reasons, I would affirm the district court's judgment due to Father's failure to state an adequate basis under the ICWA for invalidation of the termination of his parental rights.

_____

**JAMES J. WECHSLER, Judge**